[No. D036140. Fourth Dist., Div. One. Dec. 5, 2001.]

CALIFORNIA MEDICAL ASSOCIATION, INC., Plaintiff and Appellant,
v.
AETNA U.S. HEALTHCARE OF CALIFORNIA, INC., et al., Defendants
and Respondents.

154

**COUNSEL**

Catherine I. Hanson, Astrid G. Meghrigian; Sullivan, McDonald, Bramley & Brody, Sullivan & Bramley, William A. Bramley; Raffee & Edwards and John C. Edwards for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, J. Anthony Sinclitico III and Kevin R. Nowicki for Defendants and Respondents Aetna U.S. Healthcare of California, Inc., and Prudential Health Care Plan of California, Inc.

Chadbourne & Parke and Robin D. Ball for Defendant and Respondent Blue Cross of California.

Latham & Watkins and Gregory N. Pimstone for Defendant and Respondent Blue Shield of California.

Epstein, Becker & Green and William A. Helvestine for Defendant and Respondent Health Net.

Jay R. Davis for Defendant and Respondent Maxicare.

Konowiecki & Rank, Peter Roan and Thomas C. Knego for Defendant and Respondent Pacificare of California.

Nossaman, Guthner, Knox & Elliott and Stephen N. Roberts for Defendant and Respondent United Healthcare of California, Inc.

## OPINION

**KREMER, P. J.**—Plaintiff California Medical Association, Inc. (CMA) appeals a judgment dismissing this lawsuit after the court sustained without leave to amend the demurrer of defendants Aetna U.S. Healthcare of California, Inc., et al.[1] to CMA's second amended complaint. CMA contends the court erred in sustaining defendants' demurrers to CMA's second amended complaint's claim for the reasonable value of services rendered (quasi-contract) and to CMA's first amended complaint's claims for violation of Health and Safety Code[2] section 1371[3] and unlawful practices under Business and Professions Code section 17200 et seq. (the unfair competition law—UCL).[4] We affirm the judgment of dismissal.

---

[1]Other defendants are Blue Cross of California; Blue Shield of California; Health Net; Maxicare; Pacificare of California; Prudential Health Care Plan of California, Inc.; and United Healthcare of California, Inc.

[2]All further statutory references are to the Health and Safety Code unless otherwise specified.

[3]Section 1371 is part of the Knox-Keene Health Care Service Plan Act of 1975. (§ 1340 et seq. (Knox-Keene).) Knox-Keene is "a comprehensive system of licensing and regulation" (*Van de Kamp v. Gumbiner* (1990) 221 Cal.App.3d 1260, 1284 [270 Cal.Rptr. 907]), formerly under the jurisdiction of the Department of Corporations (DOC) and presently within the jurisdiction of the Department of Managed Health Care (DMHC) (§ 1341; Stats. 1999, ch. 525, § 1(a); Stats. 2000, ch. 857, §§ 19, 100). "All aspects of the regulation of health plans are covered, including financial stability, organization, advertising and capability to provide health services." (*Van de Kamp*, at p. 1284.)

[4]"The Legislature has given [Business and Professions Code] section 17200 et seq. no official name. Accordingly, we are now using the label 'unfair competition law.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 169, fn. 2 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

# I

## INTRODUCTION

In July 1999, as the assignee of claims assertedly owned by various physicians and medical groups (together Physicians), CMA brought this lawsuit seeking recovery from defendants of payments allegedly owed to Physicians for services provided by Physicians to enrollees in health care service plans[5] operated by defendants.

For purposes of determining the propriety of the orders sustaining defendants' demurrers to CMA's claims for violation of section 1371, unlawful practices under the UCL and quasi-contract, we state the facts properly alleged by CMA in its first and second amended complaints. (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757 [62 Cal.Rptr.2d 778]; *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947 [36 Cal.Rptr.2d 360].)

Defendants were licensed by the DOC to arrange for the provision of health services and to enter into agreements to provide such services. In operating their health care service plans, defendants entered into "Defendant-Enrollee Agreements" with their enrollees that imposed obligations upon defendants to pay for services rendered by Physicians to those enrollees. Defendants also entered into "Defendant-Intermediary Agreements" with various contracting entities including large medical groups, independent practice associations and limited Knox-Keene license plans (together Intermediaries). Under those Defendant-Intermediary Agreements, defendants paid their agent Intermediaries to perform specific tasks on defendants' behalf, including managing and arranging for medical services for defendants' enrollees by signing up panels of primary care and specialty physicians, processing claims and making payments to the physicians providing such services.[6] In turn, Intermediaries entered into "Intermediary-Physician Agreements" with Physicians to provide health services to defendants'

---

[5]For purposes of Knox-Keene, the term " '[h]ealth care service plan' " includes "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers." (§ 1345, subd. (f)(1).)

[6]As entities providing and paying for medical services rendered by Physicians to defendants' enrollees, Intermediaries were required to be licensed health care service plans (Health & Saf. Code, § 1395, subd. (b)) or legally authorized to practice medicine as professional medical corporations (Bus. & Prof. Code, § 2400 et seq.).

enrollees.[7] Physicians' access to the majority of insured patients in the state depended upon Physicians' participation in managed care plans. To participate in the managed care plans offered by defendants, Physicians were required to enter into the Intermediary-Physician Agreements or otherwise be accepted onto panels.

Upon providing covered medical services to defendants' enrollees, Physicians submitted to defendants via Intermediaries uncontested claims for such services. However, due to their actual or imminent insolvency, many Intermediaries failed to pay Physicians for those services. Not having any control over Intermediaries' business practices or financial stability, Physicians depended upon defendants to ensure that Intermediaries were financially stable and capable of paying Physicians for services rendered to defendants' enrollees. Nonetheless, despite knowing that Intermediaries were financially unstable and unable to pay Physicians, defendants maintained their contractual arrangements with Intermediaries and continued to make payments to Intermediaries. Further, although continuing to receive premiums from their enrollees, defendants declined Physicians' numerous demands for payments for services rendered to such enrollees.

CMA's first amended complaint, filed in September 1999, sought to state various claims based upon defendants' alleged statutory violations and contractual breaches. In particular, CMA alleged defendants did not comply with their obligations under section 1371 to reimburse Physicians in a timely manner for uncontested claims for health services provided by Physicians to defendants' enrollees. CMA's first amended complaint's prayer sought compensatory damages, restitution, injunctive relief and declaratory relief. In January 2000, in sustaining without leave to amend defendants' demurrer to CMA's first amended complaint's claim for violation of section 1371 and its derivative claim for unlawful practices under the UCL, the superior court concluded section 1371 did not create the duties alleged by CMA.[8] Further, in sustaining defendants' demurrer to CMA's first amended complaint's claims for breach of express contract, breach of implied contract, and breach of third party beneficiary contracts (to wit, the Defendant-Enrollee Agreements and the Defendant-Intermediary Agreements), the superior court granted CMA leave to amend to attempt to allege a claim for quasi-contract.

---

[7]According to CMA, the Intermediary-Physician Agreements required Physicians to "look solely" to Intermediaries for payment for services provided by Physicians to enrollees in defendants' health plans.

[8]Under the same reasoning, the superior court sustained without leave to amend defendants' demurrer to CMA's first amended complaint's claims for negligence per se and declaratory relief about CMA's rights under section 1371. Similarly, in sustaining without leave to amend defendants' demurrer to CMA's first amended complaint's claims for negligence and negligence based upon an affirmative duty arising from a special relationship, the superior court concluded that section 1371 did not impose the obligations alleged by CMA and there was no legal or factual basis to impose the suggested common law duties on defendants.

Later in January 2000, CMA filed a second amended complaint seeking to state a quasi-contract claim against defendants for recovery of the amount of the reasonable value of services rendered to defendants' enrollees by Physicians. In May 2000, in sustaining without leave to amend defendants' demurrer to CMA's second amended complaint for quasi-contract, the superior court rejected CMA's argument that it had pleaded facts bearing on "the relative relationship" of Intermediaries with defendants "on the one hand" and the "relationship" of Intermediaries with Physicians "on the other" sufficient to show that defendants were unjustly enriched. Later that month, the court dismissed CMA's action in its entirety. CMA appeals.[9]

## II

### Discussion

■ Seeking reversal of the judgment of dismissal, CMA contends the superior court should have concluded that CMA adequately pleaded that defendants abdicated their alleged obligations under Knox-Keene and principles of equity to "arrange for the provision of health care services" by not reimbursing Physicians for providing medically necessary services to defendants' enrollees when Intermediaries became insolvent. Further, asserting Knox-Keene "unequivocally mandates" appropriate reimbursement to Physicians as the providers under contract of covered medical services to defendants' enrollees, CMA contends the ultimate responsibility for payment for such services rested with defendants, despite any agreements to the contrary that defendants had demanded from Intermediaries and Physicians. CMA also faults the superior court for relying upon an interpretation of law issued by the DOC, an administrative agency no longer having regulatory authority over defendants.[10] We conclude the superior court properly sustained defendants' demurrers and dismissed CMA's lawsuit.

---

[9]Although CMA's pleadings alleged Intermediaries were defendants' agents, CMA does not proceed on appeal on any contractual theory based upon such alleged agency relationship. Instead, CMA's opening brief expressly asserts that, "if ultimately proven," the facts alleged in the pleadings would establish entitlement to relief under Knox-Keene, the UCL and "equitable restitutionary principles of quasi-contract." In that vein, we note that CMA has not pleaded that defendants directly entered into any contract with Physicians imposing upon defendants any obligation to pay Physicians' claims.

[10]In sustaining without leave to amend defendants' demurrer to CMA's first amended complaint's claims for violation of section 1371, negligence per se, unlawful practices under the UCL and declaratory relief, the superior court stated that the DOC's December 29, 1998 decision interpreting section 1371 was supported by the plain language of the statute and entitled to great weight.

A

*CMA's Claim for Defendants' Alleged Violation of Section 1371*

1

*The Statute*

At relevant times, section 1371 provided in pertinant part:

"A health care service plan, including a specialized health care service plan, shall reimburse claims or any portion of any claim, whether in state or out of state, as soon as practical, but no later than 30 working days after receipt of the claim by the health care service plan, or if the health care service plan is a health maintenance organization, 45 working days after receipt of the claim by the health care service plan, unless the claim or portion thereof is contested by the plan in which case the claimant shall be notified, in writing, that the claim is contested or denied, within 30 working days after receipt of the claim by the health care service plan, or if the health care service plan is a health maintenance organization, 45 working days after receipt of the claim by the health care service plan. The notice that a claim is being contested shall identify the portion of the claim that is contested and the specific reasons for contesting the claim.

"If an uncontested claim is not reimbursed by delivery to the claimants' address of record within the respective 30 or 45 working days after receipt, interest shall accrue at the rate of 10 percent per annum beginning with the first calendar day after the 30- or 45-working-day period. . . .

"For the purposes of this section, a claim, or portion thereof, is reasonably contested where the plan has not received the completed claim and all information necessary to determine payer liability for the claim, or has not been granted reasonable access to information concerning provider services. Information necessary to determine payer liability for the claim includes, but is not limited to, reports of investigations concerning fraud and misrepresentation, and necessary consents, releases, and assignments, a claim on appeal, or other information necessary for the plan to determine the medical necessity for the health care services provided.

"If a claim or portion thereof is contested on the basis that the plan has not received all information necessary to determine payer liability for the claim or portion thereof and notice has been provided pursuant to this section, then the plan shall have 30 working days or, if the health care service plan is a

health maintenance organization, 45 working days after receipt of this additional information to complete reconsideration of the claim. . . .

*"The obligation of the plan to comply with this section shall not be deemed to be waived when the plan requires its medical groups, independent practice associations, or other contracting entities to pay claims for covered services."* (Italics added.)

2

*CMA's Pleading*

CMA's first amended complaint's claim for violation of section 1371 alleged: Section 1371 imposed upon defendants the obligation to pay for all covered medical services rendered by Physicians to defendants' enrollees even when defendants purported to delegate such obligation to Intermediaries; within the time frames specified in section 1371, defendants failed to pay Physicians for covered medical services rendered to enrollees; and since defendants and their Intermediaries could not require Physicians to waive requirements set forth in section 1371 or other portions of Knox-Keene, any contractual provision purporting to accomplish such waiver was unlawful.

3

*Analysis*

(a)

*Statute Does Not Impose on Defendants the Payment Obligation Alleged by CMA*

CMA contends the superior court erred in sustaining without leave to amend defendants' demurrer to CMA's claim against defendants for allegedly violating section 1371 by not paying Physicians for various services provided to defendants' enrollees. Specifically, CMA asserts that despite defendants' risk-shifting agreements with Intermediaries, defendants remained obligated to Physicians under the plain language of section 1371's last paragraph (the statutory nonwaiver clause) to pay claims for those services and could not delegate those obligations to the Intermediaries. In that vein, CMA asserts section 1371 voided any language in the Defendant-Intermediary Agreements purporting to shift from defendants to Intermediaries the ultimate responsibility to pay Physicians' claims. Similarly, CMA asserts section 1371 voided the "unfair" language in the "adhesive" and

"unconscionable" Intermediary-Physician Agreements requiring Physicians to "look solely" to Intermediaries for payment. CMA characterizes those various contractual provisions as "overreaching" attempts to render Physicians remediless and guarantee that Physicians would never receive any payment from defendants. CMA also asserts the legislative and enforcement history of Knox-Keene indicates defendants were ultimately responsible for paying Physicians. CMA further asserts that Knox-Keene "unequivocally" imposed upon defendants the duty to be a "guarantor" for payment for all covered services.

■ Preliminarily, we note that any standing CMA has to seek enforcement of section 1371 appears to be limited. CMA does not have a "general power to enforce" Knox-Keene. (*Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299 [22 Cal.Rptr.2d 20].) Instead, such "power has been entrusted exclusively" to the DOC and now to the DMHC, "preempting even the common law powers of the Attorney General." (*Ibid.*) Nevertheless, "despite the existence of a statutory enforcement scheme, [CMA] may still sue to enjoin acts which are made unlawful by the Knox-Keene Act." (*Ibid.*) In any event, as we shall explain, CMA's first amended complaint did not allege facts sufficient to establish a violation of section 1371.

■ The issue whether section 1371's statutory nonwaiver clause imposed an ultimate payment obligation upon defendants is a question of law. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) We conclude such statutory nonwaiver clause did not preclude defendants from contractually delegating through the Defendant-Intermediary Agreements any alleged payment obligation to Physicians.[11] Similarly, we find nothing in the statutory nonwaiver clause negating the provisions in the Intermediary-Physician Agreements requiring Physicians to "look solely" to Intermediaries for payments for covered medical services rendered by Physicians to defendants' enrollees. On the contrary, when construed in the statutory framework of the remainder of section 1371 and other portions of Knox-Keene (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129]; *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166]), the statutory nonwaiver clause simply means that section 1371's time limits and other procedural requirements must be satisfied even when health plans have delegated their payment obligations to contracting entities under risk-shifting agreements consistent with other Knox-Keene provisions.

---

[11]As noted, CMA has not pleaded a direct contractual relationship between defendants and Physicians.

In that vein, the Legislature has specifically approved of various risk-shifting arrangements including capitation payments.[12] In particular, section 1348.6, enacted by the Legislature in the same year that the statutory nonwaiver clause was added to section 1371, expressly permits "general payments, such as capitation payments, or shared-risk arrangements" under specified circumstances. (§ 1348.6, subd. (b),[13] added by Stats. 1996, ch. 1014, § 2.) Similarly, administrative regulations contemplate the contractual shifting of financial risk from health plans to other risk-bearing entities. (E.g., 28 Cal. Code Regs., § 1300.76, subd. (b)(3)(A) & (B) [services paid for on a capitated basis are excluded when calculating a health plan's required tangible net equity].) Indeed, CMA expressly acknowledges that " 'risk-bearing organizations' may accept some risk for the provision of professional services as they may accept capitated payments." The Legislature's acknowledgement of such risk-shifting arrangements is also reflected by recent amendments to Knox-Keene imposing stricter regulations on such arrangements.[14]

---

[12]Knox-Keene administrative regulations define " 'capitated basis' " to mean "fixed per member per month payment or percentage of premium payment wherein the provider assumes the full risk for the cost of contracted services without regard to the type, value or frequency of services provided." (Cal. Code Regs., tit. 28, § 1300.76, subd. (f) [before the July 18, 2000, transfer of authority from the DOC to the Department of Managed Care and ultimately to the DMHC, Knox-Keene administrative regulations appeared in tit. 10, Cal. Code Regs.].) Similarly, CMA characterizes "capitation" as a "method of paying a set dollar amount, usually per enrollee/per month, regardless of the type or amount of health care services the enrollee needs."

[13]Section 1348.6 provides:

"(a) No contract between a health care service plan and a physician, physician group, or other licensed health care practitioner shall contain any incentive plan that includes specific payment made directly, in any type or form, to a physician, physician group, or other licensed health care practitioner as an inducement to deny, reduce, limit, or delay specific, medically necessary, and appropriate services provided with respect to a specific enrollee or groups of enrollees with similar medical conditions.

"(b) Nothing in this section shall be construed to prohibit contracts that contain incentive plans that involve general payments, such as capitation payments, or shared-risk arrangements that are not tied to specific medical decisions involving specific enrollees or groups of enrollees with similar medical conditions. The payments rendered or to be rendered to physicians, physician groups, or other licensed health care practitioners under these arrangements shall be deemed confidential information in accordance with subdivision (d) of Section 1351."

[14]In particular, the Legislature added sections 1375.4, 1375.5 and 1375.6 to establish standards and requirements for capitation and risk-shifting agreements between health plans and their contracting entities. (Stats. 1999, ch. 529, §§ 3-5.) The Legislature also enacted section 1347.15 establishing the Financial Solvency Standards Board. (Stats. 1999, ch. 529, § 1.) Further, effective January 1, 2000, the Legislature declared a two-year moratorium on contracts by licensed health care services plans "with any person, other than a licensed health care service plan or licensed health care service plan with waivers, for the assumption of

Further, our construction of section 1371 is consistent with the statute's legislative history. As originally enacted in 1986, section 1371 simply imposed certain procedural requirements, including time frames, on the processing of claims. In that vein, a legislative committee analysis of the bill adding section 1371 to Knox-Keene described the bill's purpose as to specify a time period for payment of claims since existing law simply required that health plans enact procedures for prompt payment or denial. (Stats. 1986, ch. 957, § 1; see Dept. of Corp., denial of petn. by Cal. Medical Assn. to adopt Cal. Code Regs., former tit. 10, § 1300.75 (Dec. 29, 1998), citing Sen. Ins., Claims and Corp. Com., Analysis of Assem. Bill No. 4206 (1985-1986 Reg. Sess.) as amended June 30, 1986.) CMA has not identified anything in the legislative history indicating that section 1371 was intended to impose an obligation on health plans to pay treating physicians where the plans had no contractual obligation to do so. Further, the legislative history of the 1996 amendment adding the statutory nonwaiver clause to section 1371 indicates such clause was intended simply to require contracting entities such as Intermediaries to make timely compliance with the statute's procedures for handling claims. (Stats. 1996, ch. 711, § 1. Specifically, the Legislature intended to motivate health care service plans to require their contracting entities to comply with section 1371 by subjecting the plans to disciplinary action and penalties for those contracting entities' failures. (Assem. Com. on Health, Analysis of Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996, p. 2.) CMA has not identified anything in the legislative history indicating that section 1371's statutory nonwaiver clause was intended to establish a requirement that health plans must pay treating physicians where the plans are not contractually obligated to do so or that health plans were to be guarantors of any intermediary's contractual obligations to pay those treating physicians. Moreover, recent amendments to section 1371 involving payment of interest on claims are consistent with our interpretation of the statute as merely imposing procedural requirements on claim processing. (Stats. 2000, ch. 825, § 3; Stats. 2000, ch. 827, § 3.)

Finally, our construction of section 1371 is also consistent with the DOC's decision, cited by the superior court, that denied CMA's request for a regulation to make health plans the primary obligors for payment of claims notwithstanding contractual provisions to the contrary. (Dept. of Corp., denial of petn. by Cal. Medical Assn. to adopt Cal. Code Regs., former tit. 10, § 1300.75 (Dec. 29, 1998); see § 1341.14, subd. (a).) The DOC

---

financial risk with respect to the provision of both institutional and noninstitutional health care services and any other form of global capitation." (§ 1349.3, subd. (a), added by Stats. 1999, ch. 530, § 1.)

concluded "the plain meaning of Section 1371 does not require a plan to assume liability for the payment of a claim where no such liability otherwise exists." The DOC also concluded the statute "does not create liability for the payment of claims that a plan is otherwise not responsible for paying" or "override all contractual agreements as to liability for payment that providers have entered into with other entities." The DOC further concluded that section 1371's effect with respect to health plans was only to impose a time frame for payment of claims when those plans were contractually obligated to pay such claims.

(b)

*CMA's Contentions Lack Merit*

A conclusion contrary to our construction of section 1371 is not supported by anything in other provisions of Knox-Keene or various administrative regulations cited by CMA. First, CMA contends that section 1349 prohibits Intermediaries from assuming defendants' financial responsibilities for payment of Physicians' claims.[15] However, section 1349 simply requires that health plans such as defendants' be licensed. Further, as discussed, various Knox-Keene provisions permit defendants by contract to shift financial risks to risk-bearing organizations such as Intermediaries. Moreover, CMA acknowledges the DOC has exempted contracting entities such as Intermediaries from the prohibitions of section 1349.

Section 1375.1, subdivision (a)(2), relied upon by CMA, provides that each health care service plan must demonstrate to the state that it has "[a]ssumed full financial risk on a prospective basis for the provision of covered health care services . . . ." Section 1375.1, subdivision (b)(1), also relied upon by CMA, provides that in determining whether the conditions of such statute have been met, the state may consider the "financial soundness of the plan's arrangements for health care services . . . ." However, although noncompliance with those statutory requirements bearing on the relationship between a health plan and the state may subject defendants to discipline by the state, nothing in the statutes imposes upon defendants the financial liability to Physicians alleged by CMA in this lawsuit.

CMA characterizes the second sentence of section 1375.4, subdivision (g)(1)(C) as clarifying that any delegation of payment obligations to Intermediaries did not abrogate defendants' alleged "pre-existing duty to pay"

---

[15]Section 1349 provides in relevant part: "It is unlawful for any person to engage in business as a plan in this state or to receive advance or periodic consideration in connection with a plan from or on behalf of persons in this state unless such person has first secured from the director a license, then in effect, as a plan or unless such person is exempted by the provisions of Section 1343 or a rule adopted thereunder."

Physicians.[16] However, as expressly indicated by section 1375.4, subdivision (a), the contractual provisions required by such statute apply only to agreements between health plans and risk-bearing organizations "issued, amended, renewed, or delivered in this state on or after July 1, 2000" and became effective only "as of January 1, 2001." Since the judgment in this lawsuit was entered in May 2000, section 1375.4 is not relevant to CMA's current claims. Moreover, in any event, CMA misconstrues the second sentence of subparagraph (C) of the statute's subdivision (g)(1) as purportedly affirming that at all relevant times and under all circumstances defendants had a nondelegable obligation to pay Physicians. Reasonably read, such sentence simply states that subparagraph (C) has no effect whatsoever on defendants' responsibility, if any, under existing law. In that vein, although asserting that defendants had a nondelegable "pre-existing duty to pay" Physicians, CMA has not alleged facts sufficient to establish the existence of any such underlying legal responsibility. Specifically, under the contractual framework alleged by CMA, nothing in section 1371 imposed upon defendants a duty to pay Physicians directly if Intermediaries failed to do so. Further, CMA has not pleaded that defendants and Physicians entered into any contract imposing upon defendants any obligation to pay Physicians' claims under those circumstances.

CMA contends section 1371.37, subdivision (c)(3) will prohibit health plans from engaging in the "precise" unfair payment pattern assertedly alleged here, to wit, the failure on a repeated basis to pay uncontested claims.[17] CMA also contends subdivision (g) of section 1371.37 will prohibit health plans from shifting ultimate payment responsibilities to others.[18] However, as CMA essentially acknowledges, section 1371.37 does not apply to this lawsuit because such statute did not become effective until January 1, 2001, well after judgment here. In any event, section 1371.37 does not purport to establish or affirm the existence of any underlying obligation on the part of health plans to pay treating physicians for services under the

---

[16]Included in section 1375.4, subdivision (g)(1)'s definition of " 'risk-bearing organization' " is an element that such group "[i]s responsible for the processing and payment of claims made by providers for services rendered by those providers on behalf of a health care service plan that are covered under the capitation or fixed periodic payment made by the plan to the risk-bearing organization. Nothing in this subparagraph in any way limits, alters, or abrogates any responsibility of a health care service plan under existing law." (*Id.*, subd. (g)(1)(C).)

[17]Section 1371.37, subdivision (a) prohibits a health care service plan from engaging in various defined unfair payment patterns. The statute's subdivision (c)(3) defines unfair payment plan to mean "[f]ailing on a repeated basis to pay the uncontested portions of a claim within the timeframes specified in Section 1371, 1371.1, or 1371.35."

[18]Section 1371.37, subdivision (g) provides: "A health care service plan may not delegate any statutory liability under this section."

contractual framework alleged here. Instead, the statute simply prohibits certain conduct by health plans in derogation of various statutory time requirements in processing and reimbursing claims.

CMA also relies on California Code of Regulations, title 28, section 1300.70, subdivision (b)(2)(H)1, part of the DMHC's health care service plan quality assurance program. Such regulation provides: "A plan that has capitation or risk-sharing contracts must: [¶] . . . Ensure that each contracting provider has the administrative and financial capacity to meet its contractual obligations . . . ." (*Ibid.*) However, the benefits of the DMHC's quality assurance regulations appear directed to the enrollees of defendants' health plans, not to Physicians as the providers of services to those enrollees. In any event, although noncompliance with the DMHC's quality assurance regulations might subject defendants to discipline by the state, nothing in the specific regulation cited by CMA imposes upon defendants the financial liability to Physicians alleged in this lawsuit.

CMA additionally contends that California Code of Regulations, title 28, section 1300.51 imposes upon defendants an obligation to ensure that their capitated payments to Intermediaries are actuarially sound and thus adequate to cover the costs of medical services provided by Physicians. In that vein, CMA contends defendants did not ensure that Intermediaries were financially stable and capable of paying Physicians for services rendered to defendants' enrollees but instead virtually assured Intermediaries' financial insolvency by not providing Intermediaries with sufficient funds to pay for the costs of services assertedly incurred on defendants' behalf. However, CMA has not identified anything in such regulation imposing upon defendants the financial liability to Physicians alleged by CMA in this lawsuit.[19]

Finally, we reject CMA's various claims based upon the theory that section 1371 assertedly voided the Defendant-Intermediary Agreements and the Intermediary-Physician Agreements. Preliminarily, we note that as strangers to the Defendant-Intermediary Agreements, Physicians and their assignee CMA have no standing to challenge those agreements. Similarly, with respect to the Intermediary-Physician Agreements, any actionable claim potentially available to CMA as Physicians' assignee would lie not against defendants but instead against Intermediaries, nonparties to this lawsuit. In any event, as discussed, nothing in section 1371 precluded the risk-shifting arrangement effected by the contractual framework alleged by CMA in this lawsuit.

---

[19]CMA's argument that "California's capitation rates are not based on traditional standards of actuarial soundness, but rather, whatever can be obtained in an unfair marketplace" should more properly be addressed to state regulators or the Legislature.

## (c)

### *Conclusion*

Contrary to CMA's contentions, nothing in section 1371 or elsewhere in Knox-Keene expressly provides that defendants were the only entities legally authorized to assume the financial risk for payments to Physicians for services provided to the enrollees in defendants' health plans or that defendants were otherwise prohibited from contracting with Intermediaries to bear the ultimate risk for those payments. Mindful that section 1371 is part of a detailed and complex "comprehensive system of licensing and regulation" (*Van de Kamp v. Gumbiner, supra,* 221 Cal.App.3d at p. 1284), we decline to conclude that section 1371 or its statutory nonwaiver clause in particular implicitly shifted in the manner suggested by CMA the various alleged contractual obligations and attendant financial risks among defendants, Intermediaries and Physicians. If the Legislature had intended to effect such purported major structural change in the existing highly regulated health care finance and delivery schemes, such intent would have been expressly reflected in the text of section 1371 or its legislative history. (Cf. *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1168 [278 Cal.Rptr. 614, 805 P.2d 873].)[20]

We thus conclude that under the contractual framework alleged by CMA where Intermediaries as risk-bearing organizations have agreed with defendants to be solely responsible for paying Physicians as the providers of medical services rendered to defendants' health plans' enrollees and, in turn, Physicians have agreed to look solely to Intermediaries for such payments, nothing in section 1371 imposed an independent obligation upon defendants to pay Physicians directly if Intermediaries failed to do so after defendants had already paid Intermediaries for Physician's services. Further, as discussed, under the contractual framework alleged here, defendants had no contractual obligation to pay Physicians directly in such circumstances. Instead, under risk-shifting arrangements contemplated by various Knox-Keene provisions, defendants shifted to Intermediaries any such payment obligation. With respect to that payment obligation, section 1371 and its statutory nonwaiver clause simply impose upon defendants nonwaivable time limits and procedural requirements that must be satisfied even when such payment obligation has been shifted by contract to risk-bearing obligations such as Intermediaries.

---

[20]In the "absence of clear legislative direction," courts "are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1168.)

In sum, under the allegations of CMA's pleadings, defendants as a matter of law had no liability, whether statutory or contractual, to pay Physicians directly for services rendered by Physicians to enrollees in defendants' health plans if Intermediaries failed to make such payment after defendants had already paid Intermediaries for Physicians' services. Accordingly, we conclude the superior court properly sustained without leave to amend defendants' demurrer to CMA's first amended complaint's claim for violation of section 1371.

## B

*CMA's Claim for Defendants' Alleged Unlawful Practices Under the UCL*

■ CMA's first amended complaint's claim for unlawful practices in violation of the UCL alleged: Defendants required waivers from Physicians and insisted that Physicians "look only" to Intermediaries for payment for services rendered by Physicians to defendants' enrollees and subscribers; defendants' requiring such waivers from Physicians and failing to pay Physicians for those services constituted an unfair business practice; and as a result of such conduct, defendants have been unjustly enriched by their receipt of millions of dollars in health premiums from enrollees and subscribers. In sustaining without leave to amend defendants' demurrer to CMA's first amended complaint's claim for violation of section 1371 and its derivative claim for unlawful practices under the UCL, the superior court concluded section 1371 did not create the duties alleged by CMA.

CMA contends the superior court erred in sustaining without leave to amend Defendants' demurrer to CMA's claim against defendants for UCL violations. Specifically, CMA asserts defendants engaged in "unlawful"/"unfair" business practices under Knox-Keene and particularly under Health and Safety Code section 1371 by refusing to reimburse Physicians fully for millions of dollars of medically necessary services provided to defendants' enrollees while defendants forced Intermediaries into insolvency through inadequate capitation rates, continued to pay Intermediaries despite knowledge of such insolvency, and continued to accept from the enrollees/subscribers premiums that should have provided the required financing. Similarly, CMA asserts defendants engaged in "unlawful"/"unfair" business practices under Health and Safety Code section 1371 and Civil Code section 3513[21] by requiring Physicians to enter into the Intermediary-Physician Agreements where Physicians agreed to waive their purported rights to

---

[21]Civil Code section 3513's maxim of jurisprudence provides: "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason

payments from defendants and to rely instead on the financial capacity of Intermediaries. However, CMA has not shown the superior court erred in sustaining defendants' demurrer to its UCL claim.

Although Business and Professions Code section 17200 does not confer on private party CMA a general power to enforce Knox-Keene, CMA may nonetheless sue to enjoin acts made unlawful by Knox-Keene. (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299.) As noted by the appellate court in *Samura,* "other decisions have upheld use of Business and Professions Code section 17200 to enjoin acts which are declared to be unlawful under a statutory enforcement scheme." (*Ibid.*) However, as discussed at length, defendants' business practices alleged to be unlawful and unfair by CMA did not violate the Knox-Keene statutory enforcement scheme. Specifically, under the contractual framework alleged here, nothing in Health and Safety Code section 1371 or elsewhere in Knox-Keene imposed an obligation on defendants to pay Physicians directly if Intermediaries failed to do so after defendants had already paid Intermediaries for Physicians' services. Further, by means of risk-shifting arrangements contemplated by various Knox-Keene provisions, to wit, the Defendant-Intermediary Agreements, defendants shifted to Intermediaries any payment obligations owed to Physicians.

Where, as here, the Legislature has permitted certain conduct, "courts may not override that determination" by declaring such conduct to be actionable under Business and Professions Code section 17200. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 182; accord, *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1160 [93 Cal.Rptr.2d 439] ["where the allegedly unfair business practice has been authorized by the Legislature, no factual or equitable inquiry need be made, as the court can decide the matter entirely on the law"]; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1505-1506 [82 Cal.Rptr.2d 368].)[22] Moreover, as strangers to those Defendant-Intermediary Agreements, Physicians and their assignee CMA have no standing to challenge those agreements. Similarly, with respect to the Intermediary-Physician Agreements and particularly their " 'look solely' " or " 'waiver' " clauses, any actionable claim potentially available to CMA as Physicians' assignee would lie not against defendants but instead against Intermediaries, nonparties to this lawsuit. Additionally, the "unfairness term" of Business and Professions Code section 17200 "does not give the courts a general license to review the fairness

cannot be contravened by a private agreement." In that vein, CMA characterizes this lawsuit as involving the ability of patients to obtain continuous accessible care from their treating physicians and the ability of those physicians to obtain reimbursement for such care from health plans.

[22] Under a similar analysis, Civil Code section 3513 has no applicability here.

of contracts . . . ." (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299, fn. 6; accord, *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 887 [85 Cal.Rptr.2d 301].)

In sum, since CMA's first amended complaint did not allege facts sufficient to establish a violation of section 1371 or any other provision in the Knox-Keene statutory enforcement scheme, the superior court properly sustained without leave to amend defendants' demurrer to CMA's derivative claim for violation of the UCL. (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299.)

## C

### *CMA's Quasi-contract Claim Against Defendants*

CMA's second amended complaint's quasi-contract claim against defendants for recovery of the reasonable value of services rendered alleged: The Defendant-Enrollee Agreements imposed upon defendants obligations to pay for services rendered by Physicians to enrollees in defendants' health plans; by relieving defendants of those obligations, the services provided by Physicians directly and indirectly benefited defendants; even if defendants were required to pay twice for those services, in balancing the equities between defendants and Physicians it would be fundamentally unfair for Physicians not to be paid the reasonable value of their services rendered since (1) defendants were assertedly obligated to monitor Intermediaries' fiscal soundness while Physicians were not, (2) defendants were assertedly in direct daily contact with Intermediaries and knew/should have known that Intermediaries had serious problems that would result in Intermediaries' inability to pay Physicians for services rendered to defendants' enrollees but defendants nevertheless maintained their contracts/contracts with Intermediaries during the period when Intermediaries' stability was at great risk and continued to make payments to Intermediaries rather than paying Physicians directly or requiring Intermediaries to assure that Physicians would be paid, and (3) in light of obligations assertedly imposed upon defendants by Knox-Keene and the Defendant-Enrollee Agreements, during the period when Intermediaries were unable to pay Physicians, defendants would have been required to pay unaffiliated physicians for services provided to defendants' enrollees if Physicians had not rendered such services; however, despite continuously receiving premiums from their enrollees, defendants have not made any payment to CMA or its assignors; and defendants thus owe Physicians the fair and reasonable value of the services provided by Physicians to defendants' enrollees.

In opposing defendants' demurrer to its quasi-contract claim, CMA asserted it had adequately pleaded matters raising some unspecified factual question involving "the relative relationship [between defendants] and the [I]ntermediaries on the one hand, and the relationship between the [P]hysicians and the [I]ntermediaries on the other." The superior court sustained without leave to amend defendants' demurrer to CMA's quasi-contract claim.

██ ██ ██ CMA contends the superior court erred in sustaining without leave to amend defendants' demurrer to its claim against defendants based upon the equitable restitutionary principles of quasi-contract.[23] ██ In that vein, CMA contends equity mandates that CMA as Physicians' assignee have the opportunity to demonstrate its entitlement to restitution from defendants. More specifically, CMA contends defendants have unjustly retained indisputable benefits received from Physicians' providing uncompensated services to defendants' enrollees given that defendants' "core function" under section 1345, subdivision (f)(1) was assertedly to arrange and pay for health care in a continuous and accessible manner. CMA further contends defendants directly benefited financially from Physicians' unpaid provision of care since defendants were thus relieved of the obligation to pay noncontracting physicians at nondiscounted rates. (Cal. Code Regs., tit. 28, § 1300.75.1.)[24] Moreover, CMA contends Physicians did not voluntarily choose to enter into the Intermediary-Physician Agreements but instead, in order to gain access to defendants' enrollees/subscribers, Physicians were forced to contract with Intermediaries under arrangements that "inure" not to Physicians but rather to defendants. Additionally, CMA contends defendants

---

[23]"The right to restitution or quasi-contractual recovery is based upon *unjust enrichment*. Where one obtains a *benefit* which he may not *justly retain*, he is unjustly enriched. The quasi-contract, or contract 'implied in law,' is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his former position by return of the *thing* or its *equivalent* in money. [Citations.] [¶] However, '[t]he mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.' " (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 91, pp. 122-123.) Thus, "[e]ven when a person has received a benefit from another, he is required to make restitution 'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.' " (*Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 [57 Cal.Rptr.2d 687, 924 P.2d 996]; accord, *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1663 [15 Cal.Rptr.2d 173].)

[24]California Code of Regulations, title 28, section 1300.75.1, subdivision (a)(3) requires a health care service plan to "demonstrate fiscal soundness and assumption of full financial risk" by demonstrating "an approach to the risk of insolvency which allows for the continuation of benefits for the duration of the contract period for which payment has been made, the continuation of benefits to subscribers and enrollees who are confined on the date of insolvency in an in-patient facility until their discharge, and payments to unaffiliated providers for services rendered."

did nothing to eliminate the risk that Physicians would not be paid but instead forced Physicians into financial distress and created continuity of care problems for defendants' enrollees by not following the obligations assertedly imposed on defendants by Knox-Keene to assure Intermediaries' financial solvency, not making adequate payments to Intermediaries, not monitoring Intermediaries' financial affairs to ensure Intermediaries were able to pay Physicians, and permitting Physicians to remain unpaid. CMA thus concludes that under a balance of the equities, it would be fundamentally unfair for Physicians not to be paid by defendants for the reasonable value of the services provided by Physicians to defendants' enrollees.

However, as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights. (Cf. *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1387 [88 Cal.Rptr.2d 802];[25] *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 203 [51 Cal.Rptr.2d 622];[26] *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419-1420 [49 Cal.Rptr.2d 191].[27]) "When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." (*Hedging Concepts, Inc.*, at p. 1420.) Thus, CMA may not proceed on its

---

[25]In *Eisenberg v. Alameda Newspapers, Inc., supra,* 74 Cal.App.4th 1359, the appellate court stated: "There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results." (*Id.* at p. 1387.)

[26]In *Lance Camper Manufacturing Corp. v. Republic Indemnity Co., supra,* 44 Cal.App.4th 194, the appellate court stated "it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter. [Citations.] Here, the Insured has alleged the existence and validity of an enforceable written contract between the parties in its first two causes of action. The Insured then realleges the existence of the written contract in its claim of a quasi-contract. This is internally inconsistent. The Insured must allege that the express contract is void or was rescinded in order to proceed with its quasi-contract claim." (*Id.* at p. 203.)

[27]In *Hedging Concepts, Inc. v. First Alliance Mortgage Co., supra,* 41 Cal.App.4th 1410, the appellate court stated: "A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. [Citations.] However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation." (*Id.* at p. 1419.) The appellate court also stated: "Quantum meruit is an equitable theory which supplies, by implication and in furtherance of equity, implicitly missing contractual terms. Contractual terms regarding a subject are not implicitly missing when the parties have agreed on express terms regarding that subject. A quantum meruit analysis cannot supply 'missing' terms that are not missing. 'The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability. . . .' " (*Ibid.*)

quasi-contract claim because the subject matter of such claim, to wit, whether Physicians were entitled to compensation from defendants, was governed by express contracts including the Defendant-Intermediary Agreements and Defendant-Enrollee Agreements (as specifically alleged in CMA's second amended complaint) as well as the Intermediary-Physician Agreements (as argued in CMA's opening brief). (*Eisenberg,* at p. 1387; *Lance Camper Manufacturing Corp.,* at p. 203; *Hedging Concepts, Inc.,* at pp. 1419-1420.)

Further, the record indicates that CMA is improperly seeking to proceed on a quasi-contract claim only after trying unsuccessfully by its first amended complaint to enforce various express contracts against defendants directly. (Cf. *Lance Camper Manufacturing Corp. v. Republic Indemnity Co., supra,* 44 Cal.App.4th at p. 203; *Hedging Concepts, Inc. v. First Alliance Mortgage Co., supra,* 41 Cal.App.4th at pp. 1419-1420.) Specifically, after alleging that the portions of the Defendant-Intermediary Agreements intended to limit Physicians to seeking compensation only from Intermediaries were void and unenforceable as violating section 1371 and public policy, CMA's first amended complaint sought recovery from defendants for assertedly breaching other terms of those Defendant-Intermediary Agreements by not paying Physicians the value of the services rendered by Physicians to defendants' enrollee/subscribers. Further, CMA's first amended complaint also sought recovery directly from defendants on a third party beneficiary theory for breaching the terms of the express Defendant-Intermediary Agreements and the express Defendant-Enrollee Agreements by not paying Physicians the value of those services rendered.

Moreover, since Physicians were strangers to the Defendant-Intermediary Agreements and the Defendant-Enrollee Agreements, CMA as Physicians' assignee lacks standing to the extent it now attempts through its quasi-contract claim either to affirm or to void any portion of those contracts. Similarly, as discussed, any attempt by CMA to affirm or void a portion of the Intermediary-Physician Agreements through its quasi-contract claim is misdirected as targeted only toward defendants who are nonparties to such agreements. In any event, as discussed, nothing in section 1371 or elsewhere in Knox-Keene precluded the risk-shifting arrangement effected by the contractual framework alleged by CMA in this lawsuit or otherwise obligated defendants to guarantee payment to Physicians for services rendered to defendants' enrollees if Intermediaries failed to pay Physicians after defendants had made payments to Intermediaries for those services. (Cf. *Ghirardo v. Antonioli, supra,* 14 Cal.4th at p. 51; *First Nationwide Savings v. Perry, supra,* 11 Cal.App.4th at p. 1663.)

Finally, CMA's quasi-contract claim must also fail because under the circumstances alleged here, any benefit conferred upon defendants by Physicians was simply an incident to Physicians' performance of their own obligations to Intermediaries under the Intermediary-Physician Agreements. (*Major-Blakeney Corp. v. Jenkins* (1953) 121 Cal.App.2d 325, 340-341 [263 P.2d 655].) As noted by the appellate court in *Major-Blakeney Corp.*, " 'A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.' " (*Id.* at pp. 340-341; accord, *Griffith Co. v. Hofues* (1962) 201 Cal.App.2d 502, 508 [19 Cal.Rptr. 900]; see 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 97, pp. 126-127 ["where the plaintiff acts in performance of his own duty or in protection or improvement of his own property, any incidental benefit conferred on the defendant is not unjust enrichment"].)

In sum, since under the pleaded facts CMA as Physicians' assignee was as a matter of law not entitled to restitution, the superior court properly sustained without leave to amend defendants' demurrer to CMA's quasi-contract claim for the reasonable value of services rendered by Physicians to enrollees in defendants' health plans.

### III

#### DISPOSITION

The judgment is affirmed.

Huffman, J., and McIntyre, J., concurred.

A petition for a rehearing was denied December 28, 2001, and appellant's petition for review by the Supreme Court was denied March 27, 2002. Chin, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.