Filed 3/4/13  State of Cal. v. Concerned Citizens of South Central Los Angeles CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STATE OF CALIFORNIA, | B237865 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC426044) |
| CONCERNED CITIZENS OF SOUTH CENTRAL LOS ANGELES, | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Alan Rosenfield, Judge.  Reversed.

        Klapach & Klapach and Joseph S. Klapach for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Alicia Fowler, Acting Chief Assistant Attorney General, Steven M. Gevercer, Senior Assistant Attorney General, Joel A. Davis and Paul C. Epstein, Deputy Attorneys General, for Plaintiff and Respondent State of California, acting by and through the Department of Parks and Recreation.

_____

## INTRODUCTION

This is an appeal following the trial court's grant of a summary judgment motion. We reverse.

## FACTUAL AND PROCEDURAL SUMMARY

**The Operative Pleadings**

*The State's Complaint for Rescission*

In November 2009, the State of California, acting by and through the California Department of Parks and Recreation (the State), filed a complaint for rescission of written contract against Concerned Citizens of South Central Los Angeles (Concerned Citizens).[1] According to the complaint, on July 6, 2001, the State entered into a written grant contract with Concerned Citizens (attached as an exhibit), under the terms of which the State awarded a legislatively specified State General Fund Grant to Concerned Citizens in the sum of $985,000. The State further alleged the grant contract required Concerned Citizens to use the grant money for acquisition of real property for, and development of, the Antes Columbus Youth Center Project (Youth Center) in South Central Los Angeles.

According to the State's allegations, Concerned Citizens acquired a parcel of real property in Los Angeles for the Youth Center for which it paid $252,494.23. The State reimbursed Concerned Citizens for this amount under the terms of the grant contract. Concerned Citizens had also received a grant from the United States Department of Housing and Urban Development (the HUD grant), administered by the City of Los Angeles, with which it purchased other property for the Youth Center. Beyond acquisition of the subject parcel, Concerned Citizens failed to perform under the terms of the grant contract by failing to construct the Youth Center. On or about March 20, 2008, the Los Angeles Unified School District commenced an eminent domain action (L.A.

---

[1] The State abandoned its second cause of action for breach of contract and withdrew the claim it is entitled to the condemnation deposit under Public Resources Code section 5096.343.

Sup. Ct., Case No. BC 386959) to acquire real property for construction of a school, including the subject parcel as well as parcels of property Concerned Citizens had purchased with the HUD grant. Both Concerned Citizens and the City of Los Angeles were named as defendants in the eminent domain action.

The State further alleged it had performed all required acts or was excused from performing acts not performed. As a result of the filing of the eminent domain action, the State alleged, it is impossible for the Youth Center to be built and there is a failure of consideration for the grant money awarded Concerned Citizens under the contract, and permitting the grant to stand would prejudice the public interest. The State sought to rescind the grant contract and sought restitution from Concerned Citizens, alleging the State had received nothing of value from Concerned Citizens under the terms of the grant contract.

On April 7, 2009, Judge Bendix in Department 18 determined the sum of $5,433,322.54 was the total just compensation to be paid for the property taken by eminent domain. At or about the time the eminent domain action was filed, Concerned Citizens filed suit against the City of Los Angeles with respect to the HUD grant (the Concerned Citizens action, L.A. Sup. Ct., Case No. BC389760). The City of Los Angeles cross-complained against Concerned Citizens for rescission, breach of contract, breach of promissory note, accounting and declaratory relief, alleging Concerned Citizens had failed to build a Youth Center on the property purchased with the HUD grant and instead left the property "in a blighted state as a bare dirt lot and then used the property for commercial activities" while its market value increased, "intend[ing] to 'flip' the Property to the Los Angeles Unified School District (LAUSD)" which has identified the property as the site for a new elementary school. LAUSD has instituted eminent domain proceedings and has deposited $7,370,000 with the Clerk of the Court as the property's probable fair market value.

Finally, the State alleged, the Concerned Citizens action had been temporarily assigned to Retired Judge Coleman Swart who conducted a bench trial in the action and

3

determined that Concerned Citizens had no right to the eminent domain deposit as an owner of property taken by LAUSD, but later determined (on October 29, 2009) that Concerned Citizens was entitled to be reimbursed out of the eminent domain deposit in the amount of $538,329.32 for expenses incurred in preparing to develop the Youth Center. "This money is expected to remain on deposit for the next 20 to 30 days. The State intends to seek a writ of attachment to this money. The State is informed and believes, and thereon alleges, that [Concerned Citizens] is judgment-proof. Therefore, attachment of this money may be the only opportunity for the State to insure there will be assets available to pay any judgment it receives in this action."

*The Grant Contract*

The "short-form" "Grant Contract" between the State and "Grantee" Concerned Citizens comprises four pages. On the first page, the "Project Title" is identified as "Antes Columbus Club Youth," with "Funds available from July 01, 2000 thru [sic] June 30, 2005." "Under the terms and conditions of this agreement, the applicant agrees to complete the project as described in the project description, and the State . . . agrees to fund the project up to the total grant amount indicated" not to exceed $985,000. The complete "Project Description" is "Antes Columbus Club Youth." "The General Provisions attached are made a part of and incorporated into the Contract."

Some of the General Provisions are as follows: "The term 'Project' as used herein means the Project described on Page 1 of the Contract." "Grantee shall complete the Project in accordance with the time of Project Performance set forth on page 1, and under the terms and conditions of this contract." "Grantee shall use any moneys [sic] advanced by the State under the terms of this Contract solely for the Project herein described."

Under the heading "Project Termination," the contract specifies: "1. Grantee may unilaterally rescind this Contract at any time prior to the commencement of the Project. After Project commencement this Contract may be rescinded, modified or amended by mutual agreement in writing. [¶] 2. Failure by the Grantee to comply with the terms of this Contract may be cause for suspension of all obligations of the State hereunder. [¶]

4

3. Failure by the Grantee to comply with the terms of this Contract shall not be cause for the suspension of all obligations of the State hereunder if in the judgment of the State such failure was due to no fault of the Grantee. In such case, any amount required to settle at minimum cost any irrevocable obligations properly incurred shall be eligible for reimbursement under this Contract. [¶] 4. Because the benefit to be derived by the State, from the full compliance by the Grantee with the terms of the Contract, is the preservation, protection and net increase in the quantity and quality of parks, public recreation facilities and/or historical resources available to the people of the State of California and because such benefit exceeds to an immeasurable and unascertainable extent the amount of money furnished by the State by way of grant moneys under the provisions of this agreement, the Grantee agrees that payment by the Grantee to the State of an amount equal to the amount of the grant moneys [sic] disbursed under the Contract by the State would be inadequate compensation to the State for any breach by the Grantee of this Contract. The Grantee further agrees therefore, that the applicable remedy in the event of breach by the Grantee of this Contract shall be the specific performance of this Contract, unless otherwise agreed to by the State. [¶] 5. Grantee and State agree that if the Project includes development, final payment may not be made until the Project conforms substantially to this Contract."

*Concerned Citizens' Answer*

Concerned Citizens filed its answer (in April 2010), asserting affirmative defenses including the statute of limitations, waiver and laches.

**The Stipulation**

In anticipation of the filing of "planned cross-motions for summary judgment," the parties filed a joint stipulation to shorten the time period for hearing and notice of the cross-motions under Code of Civil Procedure section 437c. According to one of the recitals in the joint stipulation, "this case raises a straightforward legal issue as to whether [the State] or [Concerned Citizens] is entitled to roughly $210,000 in condemnation proceeds;" and "the parties agree that there are no material issues of fact [no *disputed*

5

issues of material fact, sic] in this case, and that this Court will be able to resolve the instant lawsuit (one way or the other) as a matter of law in connection with the parties' planned cross-motions for summary judgment."

**The State's Motion for Summary Judgment (or Summary Adjudication)[2]**

*Argument*

In its moving papers, the State argued "[the State] can rescind the grant contract because it became impossible to perform after LAUSD condemned the subject property," and the State "is entitled to the [condemnation] deposit as restitution."

*Undisputed Facts*

Noreen McClendon is the vice president of Concerned Citizens. On or about July 6, 2001, the State entered into a written grant contract with Concerned Citizens under the terms of which the State agreed to grant Concerned Citizens up to $985,000 for the purpose of acquiring property for, and developing the Antes Columbus Youth Center in South Central Los Angeles. Concerned Citizens used a portion of the grant to purchase one parcel of real property for the Youth Center for $252,494.23. On or about March 10, 2008, LAUSD filed a condemnation action to acquire property for construction of a school. The condemnation action involved many parcels including the subject property.

As a result of the condemnation action, it became impossible for Concerned Citizens to complete its performance under the grant contract. When the condemnation action was filed, LAUSD deposited over $7 million for the property being acquired. The sum remaining on deposit includes $210,150 representing the amount deposited by LAUSD for the subject property. Concerned Citizens applied to withdraw the deposit, the State objected to the application to withdraw, and the application to withdraw the

---

[2]     The State's motion was identified as a "motion for summary judgment or summary adjudication" (and its complaint contained both rescission and breach of contract causes of action). However, the State's argument and separate statement were addressed to its first cause of action only, the State abandoned its second cause of action for breach of contract, and the trial court ultimately granted summary adjudication of this cause of action in Concerned Citizens' favor.

6

deposit was denied without prejudice (with directions to Concerned Citizen to refile before a different trial court judge (Hon. Helen Bendix)).[3] The State then filed its action for rescission (and breach of contract).

The State also asserted as an undisputed fact that "[a]t the time the condemnation action was filed, [Concerned Citizens] had not completed its performance under the terms of the grant contract: the subject property had been purchased, but the Youth Center had not been built, other than installation of an interim soccer field." Concerned Citizen disputed this fact "to the extent [the State] purports to characterize the grant contract, which speaks for itself. At the time the condemnation action was filed, the grant contract had been completed, an accounting provided, and the grant closed. . . . Concerned Citizens does not dispute that, at the time the condemnation action was filed, the Antes Columbus Youth Center Project had not been completed."

**Concerned Citizens' Motion for Summary Judgment (or Adjudication) and Opposition to the State's Motion for Summary Judgment**

*Argument*

The State's rescission claim is barred because (1) it impermissibly seeks to partially rescind the grant contract, (2) it is barred by the four-year statute of limitations because the State failed to file this action within four years of the date set forth in the contract for its completion (June 30, 2005), (3) the State has waived its right to seek rescission and is barred by the doctrine of laches because it chose not to serve its complaint until nearly five years after the contract provided for its completion, nearly two years after a related condemnation action was commenced relating to the property and nearly a year after the Superior Court entered a judgment barring the State's claim in the related condemnation action, (4) the condemnation proceedings terminated any

---

[3] The State also asserted it had moved to intervene in the condemnation action, but Concerned Citizens disputed this statement; to the contrary, Concerned Citizens stated, the State moved to intervene in a separate contract action between the City of Los Angeles and Concerned Citizens.

contractual or statutory right, interest or lien the State held in the property, (5) the doctrines of res judicata and collateral estoppel are raised by the court's April 2009 judgment in the related condemnation action and (6) the State cannot rescind a completed contract.

*Undisputed Facts*

In 2000, the State Legislature passed SB 1681, which included a general fund grant in the amount of $985,000 to Concerned Citizens for the use of the Antes Columbus Youth Project. The grant was implemented by means of a short-form contract, dated July 5, 2001. The contract provides for Concerned Citizens to receive $985,000 for use on the Antes Columbus Project. In August 2003, Concerned Citizens purchased a 4670 square foot lot to be used for the Antes Columbus Youth Football Club Project using $252,494.23 in funds received from the State's general fund grant. The complaint seeks a declaration that the "grant contract has been rescinded" and an order that the State is entitled to "(1) the portion of the grant money used by [Concerned Citizens] to purchase the subject parcel; (2) the current fair market value of the subject parcel; or (3) the amount of just compensation paid by LAUSD for the taking of the subject parcel, whichever is greater."

Page 2 of the contract specifies: "Grantee shall complete the Project in accordance with the time of Project Performance set forth on page 1." Page 1 of the contract provides that the funds would be available for use from July 1, 2001 thr[ough] June 30, 2005." The complaint was filed on November 16, 2009.

Concerned Citizens did not complete the Project by June 30, 2005. The contract provides that "the applicant agrees to complete the project" described as the "Antes Columbus Youth" Project.

On March 10, 2008, LAUSD filed an action to condemn the property owned by Concerned Citizens. (The State qualified this fact with the statement that the property had been purchased by Concerned Citizens with money from the State grant.) The State was aware of the condemnation action and related contract action between Concerned Citizens and the City of Los Angeles since at least October 2008.

8

On April 7, 2009, the Hon. Helen Bendix issued an interlocutory judgment in the eminent domain action which states: "Plaintiff filed a request for dismissal of defendants . . . All Persons Unknown Claiming any Title or Interest in or to the Property, none of said defendants having filed Answers in this case. Said defendants were dismissed by the court and are entitled to no compensation in this proceeding." The State did not enter an appearance in the condemnation action, move to intervene in the condemnation action or assert any claim to the compensation award prior to the Court's April 2009 judgment. The State did not assert a right to the condemnation proceeds until it appeared for the first time in the condemnation action on September 10, 2009, and filed an objection to Concerned Citizens' motion for a partial release of funds.

Between 2002 and 2008, Concerned Citizens spent nearly $1.4 million to develop the Antes Columbus Project, and a substantial portion of these expenses was incurred between July 2005 and March 2008. (In responding to Concerned Citizens' separate statement, the State added that it had paid Concerned Citizens approximately $600,000 under the grant contract as reimbursement for expenses incurred and Concerned Citizens was paid $406,237.03 from the amount on deposit in the condemnation action as reimbursement for expenses.) After March 2008, Concerned Citizens continued to incur substantial expenses relating to the project and related litigation as set forth in McLendon's declaration. (The State responded that this fact was irrelevant because after March 2008, Concerned Citizens knew it was impossible to complete the Youth Center, and if it continued to incur expenses, it was at its own risk; litigation expenses are irrelevant.) The State did not assert that the grant contract should be rescinded until it filed its complaint on November 16, 2009.

Concerned Citizens returned roughly $300,000 of the grant funds and spent the rest on the Project. After conducting an audit, the State approved expenditures by Concerned Citizens and closed the grant. As a result of the eminent domain action, it became impossible for Concerned Citizens to complete the project.

*Noreen McClendon's Declaration*

In her declaration filed in support of Concerned Citizens' opposition to the State's summary judgment motion (as well as Concerned Citizens' own summary judgment motion), McClendon (Concerned Citizen's Executive Director) testified as follows: Concerned Citizens is a nonprofit organization formed in 1985, and its role in the community is to provide housing and other services to economically disadvantaged people in South Central Los Angeles. McClendon supervised the Antes Columbus Club Youth Project. Concerned Citizens obtained grants from a number of different sources to help fund the Project. One source was a general fund grant from the State in the amount of $985,000, obtained at the request of then-State Assemblyman Roderick Wright by way of SB 1681.

Concerned Citizens investigated potential sites for the Project and ultimately identified a blighted three-acre lot at Slauson and Main. The property had been used as a fueling station, a lumberyard and a lamp store. It contained dilapidated buildings and underground storage tanks, had considerable environmental contamination and was being used as an illegal garbage dump. In August 2003, Concerned Citizens used about $210,000 in grant funds from the State to purchase a 4670 square foot lot for the Project; the remainder of the property to be used for the Project was purchased using a $2.1 million loan from the City of Los Angeles, funded by a HUD Community Block Grant.

After a routine audit in 2004, the State approved the expenditure of over $600,000 in grant funds, including the amount used to purchase a portion of the property for the Project, and Concerned Citizens returned the remaining $300,000. The State then informed Concerned Citizens the grant was "closed." Thus, as of 2004, Concerned Citizens had paid out the State grant funds to third parties for various expenditures relating to the Project which the State had approved before closing out the grant as evidenced by correspondence attached as exhibits to her declaration.

Beginning in May 2002, Concerned Citizens started providing youth soccer services on the Slauson and Main property. Concerned Citizens removed concrete, cleared debris and graded the site. Then it imported tons of clay and built a soccer field

10

to provide youth soccer services while the Project was in development. It also fenced and installed lighting on the property so it could be used at night. (It also obtained "porta-potties.") Between May 2002 and June 2008, the soccer facilities on Slauson and Main were used each week by more than 1800 youth playing in the North Central American Youth Soccer League and Los Angeles Soccer League as well as several adult leagues. The North Central American Youth Soccer League, composed entirely of boys and girls from the South Central Los Angeles community, used the property for practices and games seven days a week. The Los Angeles Soccer League (and several adult leagues) used the property for practices and games five nights a week. Concerned Citizens did not charge these soccer leagues for use of the soccer facilities.

Originally, McClendon said, the Project was to consist of a synthetic soccer field with field lighting, landscaping, fencing, soccer goals and a limited amount of on-site parking. However, Concerned Citizens soon realized the need for a soccer field in South Central Los Angeles was so great the field would attract people throughout the region—meaning the parking plans were insufficient and the nearby residential neighborhood would be adversely affected. Therefore, Concerned Citizens reassessed and reconceived the Project to include the installation of a soccer field built on top of a 200 plus subterranean parking structure, a community center and a park.

According to McClendon's declaration, during the fall of 2001, Concerned Citizens and City officials, including Councilwoman-elect Jan Perry and Chief Legislative Analyst Ron Deaton, discussed a plan for the City to provide $5 to $6 million in Special Parking Revenue Funds for the parking structure, and both Perry and Deaton promised to identify funds to support the Project. Deaton directed Concerned Citizens to have its architect work with various City departments to design the structure to conform to City requirements. Four to five months into this process, however, Concerned Citizens learned it would be years before the City funds would be available for the Project. In the meantime, Concerned Citizens was required to install parking meters, set up a parking meter zone and conduct a traffic study. These events caused a lengthy delay, exacerbated by a hiring freeze reducing available manpower at the City.

11

Because of the delay, Perry directed Concerned Citizens not to wait for the Special Parking Revenue Funds and to build the soccer field without subterranean parking. McClendon described various increases in costs from the architectural and engineering redesign now required (such as a more elaborate base, drainage and irrigation systems) which caused a $500,000 budget deficit and two-year delay. Nearly four years after Concerned Citizens acquired the property, in December 2005, the City Council approved the use of Special Parking Revenue Funds for the Project, but City departments refused to enter into agreements necessary for the release of the funds. Concerned Citizens was forced to pursue alternative arrangements for completing the Project, including potential partnerships with Green Dot and LAUSD.

Between 2002 and 2008, Concerned Citizens spent nearly $1.4 million to develop the Antes Columbus Youth Project, including $448, 966.59 on site improvements (environmental remediation relating to asbestos, lead and contaminated soil; grading and filling the land; removing dilapidated buildings and underground tanks and trash and vegetation removal). Concerned Citizens spent another $175,917.86 on additions to the property, including installation of the clay soccer field, landscaping, toilets, dumpsters, fencing and field lighting. The organization spent $684,648.85 for Project planning and development, including architectural design and redesign, engineering services, environmental assessment, geotechnical investigations and related expenditures. Capital expenditures, such as property taxes and insurance, totaled $89,362.73. A substantial portion of these expenses were incurred between July 2005 and March 2008.

In the spring of 2008, McClendon learned LAUSD intended to condemn the property Concerned Citizens had acquired for the Project. In March, LAUSD initiated its condemnation action against Concerned Citizens as owner, the City of Los Angeles as trustee and "All Persons Unknown Claiming An Interest In The Property to Be Condemned Herein" (BC386959). During this time, Concerned Citizens explored various alternatives with LAUSD with regard to completing the Project or varying it to provide similar services at the proposed school location.

12

In April 2009, the trial court issued an interlocutory judgment in the eminent domain action and fixed total compensation for the property at $5,587,500, noting a pending contract action between Concerned Citizens and the City (preserving these parties' rights to proceeds) as well as a tax lien on the property to be paid out of proceeds but expressly barring any claim to condemnation proceeds by anyone else. In September, Concerned Citizens filed its first application in the condemnation action, asserting its right to a release of funds relating to property that was not part of the Project at issue in the separate contract action between Concerned Citizens and the City. A week later—a full six months after the April 2009 judgment, the State appeared for the first time in the condemnation action, asserting a right to funds used to purchase property for the Project under the grant contract. The State then moved to intervene in the contract action between Concerned Citizens and the City, but the State's motion was denied. The trial court in the condemnation proceeding (Hon. Coleman Swart) also denied without prejudice Concerned Citizens' application for release of funds and transferred the action to the Honorable Helen Bendix.

In March 2010, the State served Concerned Citizens with its complaint for rescission.

According to McClendon, over the past few months (prior to her March 2011 declaration), Concerned Citizens has been working with its elected State representatives to make arrangements to apply any proceeds from the eminent domain action to related projects within the community. As evidenced by attached exhibits, McClendon said, Former State Assemblyman Roderick Wright who requested the original grant in 2000 and current Assemblywoman Isadora Hall have both written letters expressing their "strong desire that the resources from the LAUSD eminent domain action remain with and be available to Concerned Citizens to serve the community the funds were originally

13

intended to serve."[4]  According to their letters, in approving the original $985,000 State grant, the Legislature "intended for these funds to be put to use by Concerned Citizens in the community that it serves"—South Central Los Angeles.

**The State's Opposition to Concerned Citizens' Motion for Summary Judgment (and Reply to Concerned Citizens' Motion)**

The State argued that (1) the judgment in the condemnation action did not bar the State's claim under the doctrine of res judicata because the State's rights under the grant contract were not litigated in the condemnation action; (2) Concerned Citizens' assertion of the statute of limitations as an affirmative defense was waived for failure to specify the applicable code section; (3) even if the statute of limitations applies, it did not begin to run until March 2008 when the eminent domain action was filed, making Concerned Citizens' performance impossible; (4) rescission is an available remedy because the grant contract was never completed (citing deposition testimony in which McClendon answered that no one from the State had told her of a deadline for completion of the Project); (5) the State was not improperly seeking partial rescission because it could not receive full restitution; and (6) rescission was not barred by the doctrine of laches because Concerned Citizens could not demonstrate substantial prejudice, let alone any prejudice at all.  To the contrary, the State argued, Concerned Citizens "wants to be in a *better* position by keeping the money on deposit in the condemnation action."

**Concerned Citizens' Reply**

In addition to reiterating its prior arguments, Concerned Citizens said its statute of limitation defense was properly raised, the deposition testimony the State cited regarding McClendon's understanding there was no specified completion date for the Project did not change the fact the grant contract plainly stated a completion date of June 30, 2005, and a party cannot rescind a completed contract.  McClendon also submitted another declaration disputing the State's claim Concerned Citizens had been reimbursed in full

---

4       According to the attached documentation, LAUSD displaced the Project by eminent domain in order to build the Juanita Tate Elementary School, named to honor Concerned Citizens' founding Executive Director who died in 2004.

14

for all of its expenditures and providing documentation supporting its claim that, even after accounting for all grant funds, Concerned Citizens had paid out more than $600,000 toward the Project between 2002 and 2008 for which it had not been reimbursed and continued to owe more than $300,000 to various vendors.

**The First Hearing**

At the outset of the first hearing (April 5, 2011), the trial court indicated the intention to request further briefing to better frame the issues.[5] After the State's counsel indicated the State was relying on the "Civil Code sections that govern restitution, unjust enrichment," the trial court asked what authority supported the State's asserted right to restitution where rescission could not be accomplished; the parties could not be restored to their positions before entering into the contract, and partial rescission was what the State wanted. In response, counsel for the State argued: "The point is the equitable reason behind [sic] is to give back any benefits it's [sic] received. . . ." The trial court asked, "Can I reach that in summary judgment? Can I reach the equitable issue in summary judgment?" Counsel for the State responded, "I don't see why not because it's based on undisputed facts." For Concerned Citizens to keep the condemnation proceeds "is unquestionably unjust enrichment." The same would be true, he said, if the Project was not completed for any other reason.

The trial court then asked, "What if the park had been built and then condemned?" The State acknowledged the analysis might change under such facts, but in this case, the Project had not been completed.[6] If there had been no condemnation action, the State said, there would be a specific performance action available "in perpetuity." The trial

---

[5]    The trial court had researched statutory authority and case law under the Public Resources Code as referenced in the State's complaint, but the State acknowledged that further research revealed the Public Resources Code as cited in the complaint was inapplicable; instead, the State was relying on the Civil Code.

[6]    According to the State, "maybe" the statute of limitations barred the breach of contract cause of action, but not the rescission claim because impossibility did not arise until the condemnation action.

15

court said, "[R]escission is equity though, is it not?" Counsel for the State responded that, as a matter of law, it was contrary to public policy for Concerned Citizens to keep money that was not used for the Project for which the grant was made. Concerned Citizens' counsel disagreed, stating public policy encouraged parties to engage in such efforts for the "public good." Concerned Citizens is a nonprofit organization working to help the most economically deprived areas of South Central Los Angeles, he argued. It undertook the Project, spent $1.4 million and was now out of pocket $600,000, but the State says the public policy is "[Y]ou're stuck for all this money you spent in good faith" while the condemnation proceeds should go back to the State—an extremely unjust and unfair position.

The trial court asked the parties to file supplemental letter briefs to address the issues raised at oral argument.

**Supplemental Briefing**

*Concerned Citizens' Supplemental Brief*

In its first supplemental brief, Concerned Citizens argued the limitation of remedies provision in the State-drafted grant contract restricted the trial court's authority to resolve the State's claim and evidenced the parties' intention that the appropriate remedy was specific performance. Absent this provision, the court would have two relevant equitable powers: (1) the equitable power to *rescind* the contract (Civ. Code, §§ 1691-1692), based on disaffirming the contract and restoring the parties to the positions they occupied before entering into the contract—a remedy unavailable under the circumstances of this case; and (2) the equitable remedy of *restitution*, a remedy available in the event of a breach of contract, necessarily subject to Concerned Citizens' affirmative defenses (statute of limitations, waiver, laches, res judicata) and inappropriate in light of the specific performance provision. Concerned Citizens argued the court could easily effectuate the parties' intended remedy simply by ordering the funds to be used on the Project at its new location.

16

In exercising its considerable discretion, Concerned Citizens urged the trial court to consider the profoundly unfair result if the State were to receive the condemnation proceeds while Concerned Citizens, which had devoted seven years and spent $1.4 million (recovering only $400,000 of this amount and still in considerable debt), was penalized for the unexpected condemnation action—contrary to the public policies of finality in condemnation proceedings and of encouraging nonprofit organizations like Concerned Citizens to undertake projects for "the preservation, protection and net increase in the quantity and quality of parks [and] public recreation facilities . . . available to the People of the State of California." At the very least, Concerned Citizens argued, there are triable issues of material fact as to the respective benefits conveyed by the parties; to the extent the State had any right to restitution of benefits conferred, Concerned Citizens had an offsetting right to recover benefits it had conferred, as evidenced by McClendon's declaration as well as the declaration of Mark Williams, a member of Concerned Citizens' Board of Directors and Project Director of the Antes Columbus Youth Project.

*Williams's Declaration*

According to Williams, after the 2008 condemnation of the original Slauson and Main property, Concerned Citizens relocated the project to Carver Middle School— approximately three miles from the original site. The new site was secured by a Joint Use Agreement between LAUSD and Concerned Citizens and provided LAUSD students with use of the improvements during school hours while Concerned Citizens had use of the improvements after school and on weekends for 20 years. (A copy of the agreement was attached as an exhibit to Williams's declaration.) Concerned Citizens would provide a free after school program for community children for the next 10 years. The first phase of the Project's scope includes an 87,500 square foot synthetic surface soccer field, restrooms, field lighting, fencing, landscaping, an electronic video scoreboard, a 750 spectator seat grandstand, six basketball courts and 150 parking spaces. The second phase would include a 6,000 square foot pocket park, 25 parking spaces and a 25,000

17

square foot field house with a commercially equipped kitchen, digital video/audio production facilities, locker rooms, restrooms, 100 spectator seats, aquatic training equipment, administrative space and a caretaker's residence. Williams said the structure was in the design phase (as evidenced by a copy of the attached design plans) and would require another 18 months for completion. Concerned Citizens planned to use the condemnation proceeds to purchase the grandstand and video scoreboard in the first construction phase.

*The State's Supplemental Brief*

In its supplemental brief, the State argued (1) it had properly sought restitution within its rescission cause of action; (2) Concerned Citizens was not entitled to the condemnation deposit as reimbursement for other expenses allegedly incurred in connection with the Project because those expenses were not incurred in reliance on the grant contract and the State was not contractually obligated to pay those expenses; (3) public policy required returning the condemnation deposit to the State because payment to Concerned Citizens would constitute a gift of public funds in violation of the California Constitution and (4) if the grant contract is rescinded and the condemnation deposit paid to the State, Concerned Citizens will be restored to its pre-contract position.

**The Second Hearing**

According to the reporter's transcript of the May 2011 hearing, the trial court again expressed concern whether the case could be resolved on summary judgment as it appeared the issue turned on the "exercise of [the court's] equitable discretion." Concerned Citizens argued the Project had simply relocated to a new site at the Culver Middle School where construction was ongoing. The State responded that the grant money was "given only to purchase property or use in another manner for this Project" and "this current project is not identical" so the State was entitled to get the money back. The State maintained there were no triable issues of material fact. Concerned Citizens argued the State's rescission claim was infirm as a matter of law but to the extent the court would exercise its equitable discretion, factual findings were required and summary

18

judgment was precluded.   After hearing argument, the trial court indicated "it may be that I would have to conduct a trial in order weigh evidence and exercise my discretion based on inferences that can be drawn from the evidence."  The trial court then provided the parties two weeks to submit additional supplemental briefs "on whether [the trial court] can reach the issues of the court's exercise of discretion in equity without conducting a trial, or can [the court] determine [such issues on] summary judgment."

According to the case summary, both parties filed (second) supplemental briefs in mid-June but the State's brief is not included in the record on appeal.  In its second supplemental brief, Concerned Citizens argued the trial court could not resolve disputed material issues of fact on summary judgment—"even if the claims involved are equitable in nature and will ultimately be resolved in a bench trial."

**The Trial Court's Decision**

With respect to the State's rescission cause of action, noting the "purpose of rescission is to restore the parties to the position they would have been in had they not entered into the contract" (*Akin v. Certain Underwriters at Lloyd's London* (2006) 140 Cal.App.4th 291, 298), the trial court determined the "claim for rescission fails.  [The State] is seeking partial rescission of the contract" but had "not submitted a persuasive argument as to why partial rescission should be granted."  However, because "the first cause of action also pleaded an unjust enrichment theory, the Court need not rescind the contract in order to grant [the State] relief under the first cause of action" and found the "facts alleged support a claim for unjust enrichment."  Quoting *Hernandez v. Lopez* (2009) 180 Cal.App.4th 932, 939, the trial court stated:  "'The phrase "Unjust Enrichment" does not describe a theory of recovery, but an effect:  the result of a failure to make restitution under circumstances where it is equitable to do so.'"'  Further, the trial court determined Concerned Citizens could not argue it did not have sufficient notice of the restitution claim, finding the State's motion argued the State was "entitled to the deposit as restitution."  (See *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 69.)  The trial court found that Concerned Citizens did not provide a public service for

19

the $210,000 and it would be unjustly enriched by payment of the funds. The trial court further noted a triable issue "*could*" exist as to whether the State had waited too long to assert its right to the condemnation proceeds but Concerned Citizens had not shown prejudice. (Civ. Code, § 1693, emphasis added [rescission "shall not be denied because of delay in giving notice of rescission unless such delay has been *substantially prejudicial* to the other party"].) The trial court granted the State's motion for summary adjudication of its first cause of action for rescission.[7]

The trial court found Concerned Citizens' motion involved the same issues as the State's motion, and without further discussion, denied Concerned Citizens' motion for summary adjudication of the State's cause of action for rescission, and awarded the State the "amount of money representing the eminent domain proceeds for the property in question."

Concerned Citizens appeals from the judgment subsequently entered.

## *DISCUSSION*

**Standard of Review**

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action. . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850.) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable

---

[7] Finding the condemnation judgment had made Concerned Citizens' performance of the grant contract impossible and noting the State had not addressed its breach of contract cause of action in its motion, opposition, reply or supplemental briefing and therefore had conceded the issue, the trial court granted Concerned Citizens' motion for summary adjudication of the second cause of action for breach of contract (and denied the State summary adjudication of this cause of action).

20

issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850.) Where summary judgment has been granted, we review the trial court's ruling de novo. (*Id.* at p. 860.) We consider all of the evidence presented by the parties in connection with the motion (except that which the trial court properly excluded) and all of the uncontradicted inferences that the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We affirm summary judgment where it is shown that no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).).

A motion for summary judgment is properly granted only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)[] We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal. Rptr. 3d 32, 71 P.3d 296].)" (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1301, fn. omitted.) On review of an order granting summary judgment, we view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's. ( *Id.* at p. 1302, citing *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284.)

**Rescission, Restitution and Unjust Enrichment.**

The trial court determined the State's rescission claim failed but concluded the State had also pleaded an unjust enrichment theory entitling the State to the condemnation proceeds as restitution.

"'[T]here is no cause of action in California for unjust enrichment.'" (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350 (*Durell*), 1370, quoting *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793; and see *McKell v. Washington*

21

*Mutual, Inc*. (2006) 142 Cal.App.4th 1457, 1490 ["unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust"].) "Unjust enrichment is synonymous with restitution." (*Durell, supra,* 183 Cal.App.4th at p. 1370, citing *Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1314.)

"There are several potential bases for a cause of action seeking restitution. For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason. [Citations.] Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory . . . . [Citations.] In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment." (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388, fn. omitted.)

"'Under the law of restitution, "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.]" [Citation**.]** However, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it. [Citation.]"' (*McBride v. Boughton, supra*, 123 Cal.App.4th at p. 389.) As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract. (*California Medical Assn v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172 [114 Cal.Rptr.2d 109].)" (*Durell, supra,* 183 Cal.App.4th at p. 1371.) "'There is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected.'" (*Durell, supra,* 183 Cal.App.4th at p. 1371, quoting *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1593.)

As noted in *Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 317, footnote omitted, a case on which the State also relies, "California decisions, in

22

determining when restitutionary damages should be awarded, have differentiated between actions for rescission based upon a ground involving some fault on the part of the nonrescinding party, and actions based upon a ground not involving such fault. Only in the former category have courts of equity required the nonrescinding party to pay to the other restitutionary damages, for the obvious reason that otherwise he would be unjustly enriched."

Citing Civil Code sections 1598 and 1689, subdivision (b)(3), the State says it had the right to rescind the grant contract when it became impossible to perform. According to the State, "[T]he sole purpose of the grant contract was construction of the Youth Center, and that became impossible when the School District condemned the subject property." As relevant, Civil Code section 1598 provides: "Where a contract has but a single object and such object is . . . wholly impossible of performance . . . the entire contract is void." Pursuant to Civil Code section 1689, subdivision (b)(3), a contract may be rescinded "[i]f the consideration for the obligation of the rescinding party becomes entirely void from any cause."

According to Concerned Citizens, the trial court erred in granting the State's motion for summary judgment for numerous reasons: (1) an unjust enrichment theory is inconsistent with the grant contract, (2) Concerned Citizens would not be unjustly enriched if it were permitted to use the condemnation proceeds to complete the project at its new location because the contract did not require that the project be completed at the original location, (3) the contract contained an express provision limiting the available remedy to specific performance, (4) any ambiguities must be construed against the State, (5) triable issues of fact existed as to whether Concerned Citizens "unjustly retained" a benefit at the State's expense, (6) the trial court failed to give Concerned Citizens a fair opportunity to respond to the new unjust enrichment theory, (7) the State's claim it is entitled to condemnation proceeds for the property is barred by the judgment in the condemnation action, and (8) there were triable issues of material fact concerning whether the State's claim was barred by the doctrines of laches and waiver.

23

On this record, we conclude the trial court erred in granting summary judgment on the State's rescission cause of action because there were triable issues of material fact as to whether the consideration for the State's obligation became entirely void within the meaning of subdivision (b)(3) of Civil Code section 1689 as the State contends. As recited in the State-drafted grant contract, "the benefit to be derived by the State, from the full compliance by [Concerned Citizens] with the terms of the Contract, is the preservation, protection and net increase in the quantity and quality of parks, public recreation facilities and/or historical resources available to the people of the State of California" and "such benefit exceeds to an immeasurable and unascertainable extent the amount of money furnished by the State by way of grant moneys under the provisions of this agreement." The State's grant contract describes the "Project" only as "Antes Columbus Club Youth." Not only did Concerned Citizens present evidence it had already contributed to the contemplated increase in public recreation facilities by operating temporary soccer fields at the original Project site, but notwithstanding the condemnation action, Concerned Citizens presented evidence that the Project was "ongoing" at the new site about three miles away from the original and was serving the same South Central Los Angeles community.

State identifies no provision in the grant contract, no statute or any other authority which would allow the State to retain control over the property in perpetuity. As the State recognizes, it was always contemplated and understood that the Antes Columbus Youth Project would be funded not only with State grant funds but also HUD grant and other sources of funds. The State fails to explain how its belated assertion that the fact Concerned Citizens would now also receive funds from and work with LAUSD would alter the "Project" in such a way that the State is entitled to take back the grant funds. Similarly, the State asserted at oral argument that the change of location (a distance of about 3 miles) constitutes a modification of the grant contract that the State would have had to approve (while conceding that such purported evidence is not in the record).

24

It follows that summary judgment was not properly granted on the record presented.[8]  On remand, the trial court may ascertain whether the matter may still be resolved on summary judgment.

## *DISPOSITION*

The judgment and order granting the State's motion for summary adjudication of its rescission cause of action is reversed; the order denying Concerned Citizens' motion for summary adjudication of the rescission cause of action is affirmed.  The matter is remanded for further proceedings not inconsistent with this opinion.  Concerned Citizens is entitled to its costs of appeal.


**WOODS, J.**


**We concur:**



**PERLUSS, P. J.**                                **JACKSON, J.**

---

[8]     Concerned Citizens also says the trial court erred in denying Concerned Citizens' motion for summary judgment or adjudication for "many of the same reasons" the court erred in granting the State's motion.  Denial of one party's motion for summary adjudication does not necessarily compel a grant of the opposing party's "cross-motion," and Concerned Citizens failed to otherwise meaningfully address its own motion in its opening brief.  "A summary judgment is proper only if there is no triable issue of fact and, as a matter of law, the moving party is entitled to judgment. (Code Civ. Proc., § 437c.)  The fact that both parties moved for summary judgment does not conclusively establish the absence of a triable issue of fact; the trial court must independently determine the motions."  (*Tahoe Reg'l Planning Agency v. King* (1991) 233 Cal.App.3d 1365, 1375, citations omitted.)