Filed 1/13/16 Modified and Certified for Pub. 2/1/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNILAB CORPORATION etc. et al., | B255136 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. VC060983) |
| v. | |
| ANGELES-IPA etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Margaret Bernal, Judge.  Affirmed.

Law Offices of Bruce Adelstein and Bruce Adelstein; Lanak & Hanna, Joseph M. Hanna, Craig P. Bronstein and Marc W. Cabal for Plaintiffs and Appellants.

Yong Gruber Associates and Jindy Gruber; Burhenn & Gest, Howard Gest and David W. Burhenn for Defendant and Respondent.

_____

Plaintiff Unilab Corporation, doing business as Quest Diagnostics (Quest), seeks payment from defendant Angeles-IPA (Angeles) for out-of-network laboratory testing services that were ordered by in-network physicians for Angeles patients. Quest presented several theories, including breach of implied contract, unjust enrichment, quantum meruit, and common counts. Angeles moved for summary adjudication, which the trial court granted as to all but two causes of action that were subsequently dismissed by Quest. Judgment was entered for Angeles based on the summary adjudication rulings. Quest appealed. Finding no triable issue of material fact, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Angeles is an independent physicians association (IPA) that contracts with various health care plans to facilitate the delivery of health care services to enrollees of the plans. Under these contracts, which are regulated by the Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq., (Knox-Keene Act)), the plans assign their enrollees to Angeles, and Angeles contracts with various health care providers to render covered services to enrollees assigned to Angeles. The health plans pay Angeles a fixed monthly fee per enrollee (capitation fee), regardless of the amount of services actually utilized. Angeles pays its in-network physicians a fixed monthly fee per enrollee.

Angeles physicians decide whether to order laboratory tests for Angeles patients. Generally, Angeles physicians are told to use the in-network laboratory—the laboratory that has contracted with Angeles to provide testing services for a fixed monthly fee per enrollee (also referred to as the contracted laboratory).

Quest is a clinical laboratory that provides testing and reporting services for a variety of health care providers. It furnishes "drop boxes" or "lock boxes" to physicians who contract with an IPA which has contracted with Quest for laboratory testing services. This case involves specimens that are drawn by the physician at his or her office, and placed in a sealed container along with a completed Quest requisition form in a Quest drop box at the physician's office, where it is picked up by a courier service for delivery to the Quest laboratory. For each specimen placed in the Quest drop box, the physician

2

fills out a Quest requisition form with names of the physician, the patient, and the patient's insurance company (i.e., the patient's IPA or payor that will pay for the test), and the specific tests requested. When the specimen arrives at the Quest laboratory, the information from the test requisition form is logged into a computer system for tracking purposes, and the specimen is sent to the laboratory for testing. The payment information—the identity of the patient's IPA/payor—is not confirmed until later in the process when the test requisition form is sent to Quest's billing department. At that point, a payment dispute may arise if, as in this case, a physician had misdirected a specimen to Quest rather than the laboratory that had contracted with the patient's IPA/payor to provide laboratory testing services on a capitation fee basis.

In 2005, Quest contracted with Angeles to provide laboratory testing services for Angeles patients on a capitation fee basis. After that contract expired in 2007, Quest contracted with Angeles to provide laboratory testing services on a fee-for-service basis. When that contract expired at the end of November 2009, Angeles told its physicians to send all laboratory tests to a different contracted laboratory, AMA Laboratory.[1] Angeles notified Quest that because its services would be out-of-network, its services would not be authorized by Angeles.

When Angeles terminated its contract with Quest, some Angeles physicians who belonged to other IPA's that had contracts with Quest (Quest-affiliated IPA) continued to maintain Quest drop boxes in their offices for their patients who belonged to a Quest-affiliated IPA. On occasion, these physicians erred in placing specimens from Angeles patients into the Quest drop box, along with Quest requisition forms that either erroneously identified the patient's IPA/payor as a Quest-affiliated IPA, such as Apple Care, or failed to list any IPA/payor for that patient. The error as to the identity of the patient's IPA/payor was not apparent on the face of the requisition form, because the name "Angeles" did not appear anywhere on the form. Quest claims that where the name of the patient's IPA/payor was left blank, it performed the test assuming that because the

---

[1] In 2012, Laboratory Corporation of America (Lab Corp) became the new contracted provider of laboratory testing services for Angeles.

specimen had been placed inside a Quest drop box by a physician who belonged to a Quest-affiliated IPA, the patient was authorized to receive services from Quest. It was not until after Quest performed the test that it learned, through its billing department, that the patient's IPA/payor was Angeles, which no longer had a fee-for-service contract with Quest after November 30, 2009. We refer to the tests performed by Quest on the misdirected specimens as the post-contract tests.

The issue in this case is whether Angeles is obligated to pay for post-contract tests ordered by Angeles physicians who, because they simultaneously belonged to a Quest-affiliated IPA or due to some other error, had a Quest drop box at their office, and mistakenly placed specimens and Quest requisition forms for Angeles patients inside the Quest drop box. Quest seeks recovery of $174,134.28 plus interest and other costs for these post-contract tests. In its original complaint, Quest alleged causes of action for breach of contract; work, labor and services/agreed price; open-book account; account stated; unjust enrichment; and reasonable value of work, labor and services. In its amended complaint, Quest alleged additional causes of action for breach of implied contract (in-fact and in-law), breach of third party beneficiary contract, and declaratory relief.

Quest relies on three principal theories. First, that Angeles is liable under an agency theory for the post-contract tests ordered by its physicians for Angeles patients. Second, it is entitled to quasi-contract restitution based on unjust enrichment. Third, a legal obligation to pay for covered services was created by the contracts between Angeles and the health plans, as indicated by the Knox-Keene Act.[2]

A. *Evidence Provided by Angeles*

Angeles filed two motions for summary adjudication. The first addressed the causes of action in the original complaint, the second addressed the additional causes of action in the amended complaint. The evidence in support of the motions included

---

[2] Quest concedes that the Knox-Keene Act does not expressly state "whether an IPA or a testing laboratory should bear the cost of laboratory tests requested by doctors who misidentified the patient's health plans."

4

declarations by SynerMed executives Sheryl Reese and Darren McLachlan. SynerMed is a management firm that provides services to Angeles and other IPA's.

Reese stated that SynerMed processes and pays claims submitted to Angeles for services rendered by in-network physicians and in-network providers of ancillary services. When SynerMed denied the post-contract claims by Quest, it sent an "Explanation of Benefits" stating that these services were not authorized.

McLachlan stated that Angeles has 400 in-network physicians, many of whom simultaneously belong to several if not dozens of other IPA's. Angeles instructs its contracted physicians to refer Angeles patients only to in-network providers. Generally, Angeles pays its in-network providers from the capitated fees paid by the health plans. Angeles tells its physicians that if they "send a patient 'out-of-network,' Angeles generally will not be responsible for payment."

McLachlan explained that there are two types of laboratory services agreements, fee-for-service and capitation. Under a capitation arrangement, Angeles pays "a flat fee in exchange for the laboratory's commitment to do all of the labwork ordered by Angeles-contracted physicians for the benefit of Angeles-assigned enrollees." Under a fee-for-service agreement, Angeles pays the laboratory on a per test basis.

McLachlan explained that when the fee-for-service contract with Quest ended on November 30, 2009, Angeles informed its physicians that "they should no longer send specimens of Angeles-assigned enrollees to Quest." McLachlan stated that "[i]t is the physician who chooses which laboratory to send a specimen for analysis. If the physician sends the specimen to a laboratory with which Angeles has a contract, i.e., an in-network laboratory, then the physician is not responsible for payment. If the physician sends the specimen to a laboratory with which Angeles does not have a contract, i.e., an 'out-of-network' laboratory, the physician is responsible for payment." McLachlan represented that Quest's claims for post-contract services were denied because Angeles had "advised Quest that the services, being out-of-network services, were not authorized by Angeles."

The contract between Angeles and each primary care physician stated that the physician provides covered medical care and services "on behalf of" Angeles to its

5

enrollees. The physician is responsible for managing the health care of Angeles patients, and monitoring, coordinating, approving (except in the case of an emergency) all covered services. The quality of the services provided to the patients is the physician's primary concern, and nothing in the physician agreement will "be interpreted to interfere with the physician-patient relationship." The physician is free to discuss all treatment options with the patient, and to provide the medical advice and treatment that the physician deems appropriate. The physician is allowed to care for patients of other IPA's. The contract between Angeles and the physician explained that the relationship between them is "solely that of independent contractors," and that the parties were not "creating a relationship of employee and employer, partner, co-venturer, or agent . . . ."

       B.      *Evidence Provided by Quest*

Quest disagreed with SynerMed's stated explanation for the denial of its claims—that its out-of-network services were not authorized. Quest pointed out that SynerMed paid some of its claims for post-contract services, and charged or "cap-deducted" the Angeles physicians who ordered the tests. (The term "cap-deduct" refers to withholding a portion of the physician's capitation fee.)

At his deposition, McLachlan testified that Angeles includes a provision in its agreements with specialty physicians that allows cap-deductions, but this provision is not included in the contracts with primary care physicians (PCP's).[3] He stated that the misdirection of specimens to non-contracted laboratories, or "leakage," is an industry-wide problem, and that Angeles developed several strategies to deal with it. One was to cap-deduct the contracted laboratory for the tests that were misdirected to the out-of-network laboratory. But that strategy was rejected when LabCorp, the contracted laboratory for Angeles, objected. Another involved progressive discipline: for a first violation, the physician received a warning and "follow-up education"; for a second, a stern warning was issued; and for a third, the cap-deduction was imposed against the

---

[3] The term "primary care physicians" is used to encompass family practice, general practice, internal medicine, and pediatrics. The term "specialty physicians" covers all other practice areas.

6

physician who misdirected the specimens. But at some point, that strategy also was abandoned, and Angeles ceased paying for the misdirected tests.

Quest maintained that Angeles was aware of its obligation to educate its contracted physicians on which laboratories to use, as illustrated by an email chain dated September 25, 2009. In the first email in that chain, Reese asked McLachlan about tests referred to Quest by Angeles PCP's who were not authorized to use Quest. McLachlan replied, "The ones we authorized we need to pay for." Reese responded, "These are not auth'd—but referred by PCPs. I will instruct examiner to process as [fee for services] and cap deduct if not assigned to use Quest." McLachlan agreed that "[c]ap deducting them is our best bet."

In an email dated December 15, 2009, Dr. Sanchez, a SynerMed claims examiner, asked McLachlan about "the Quest claims." McLachlan replied that "[a] meeting was held with Quest and they are insisting that their authorization is coming from the PCP or Specialist sending them the lab work. They insist it is up to us to control our network. Part of the problem is that the lab panels are processed at their facility and eligibility isn't verified until the panel is processed. As such it is impossible for them to deny services. [¶] We need to ensure that we cap deduct providers as a training method. That is about the only recourse we have."

Quest pointed out that Angeles pays the out-of-network laboratories for "sensitive services" such as pregnancy or HIV testing without prior authorization. Quest argued that because some tests do not require prior authorization, SynerMed's denial of its claims was suspect.

Dr. Ana Rodas, an Angeles director, testified at her deposition that she belongs to several IPA's including Angeles, Apple Care, and Bella Vista. Apple Care and Bella Vista have contracts with Quest, and Rodas has laboratory requisition forms for both Quest and LabCorp (the laboratory currently used by Angeles). Rodas was asked: "As a physician and as a [member of the] board of directors for Angeles-IPA, do you believe that, if a lab performs a laboratory test that's placed in its drop box using its requisition form, do you believe they should be paid for the services provided?" She responded yes.

Quest produced test requisition forms that were received from Rodas between September 2011 and January 2013. Some of the forms erroneously identified the patient's IPA/payor as Bella Vista; others did not identify the patient's IPA/payor.

Similarly, Dr. Narciso Azurin, the founder and president of Angeles, belongs to more than one IPA, including Apple Care. Like Rodas, Azurin sent Quest numerous requisition forms that erroneously identified the patient's IPA/payor as Apple Care. Quest performed the tests based on the misrepresentation that the patient's IPA/payor was Apple Care, and only later learned that the patients belonged to Angeles. At his deposition, Azurin was presented with a hypothetical situation in which he was told to assume "there is no contract as between the noncontracted laboratory and the IPA, but for whatever reason, the specimen gets to the lab. The lab does the work, gives the results to the doctor. Do you think that the lab should get paid for its work?" In response to the stated hypothetical, Azurin answered, "No, because in the first place they should not have . . . performed the test . . . They should have thrown the specimen away."[4]

Dr. Lee Hilborne, Quest's corporate medical director, defended the laboratory's practice of testing specimens that are placed inside a Quest lock box by a physician who belongs to a Quest-affiliated IPA, without waiting for its billing department to verify the patient's IPA/payor information. According to his declaration, a laboratory has an ethical and moral obligation to perform tests in a timely manner. This "includes the obligation not to delay treatment of a patient because of an administrative billing issue." Many tests are time-sensitive (e.g., blood glucose, hypo and hyperglycemia, gestational diabetes, elevated bilirubin, strep throat, and skin, breast, and cervical biopsies), and delays would endanger the patient.

Kara Stonebreaker, the revenue services manager for Quest, stated in her declaration that the billing process does not begin until after the specimen is tested. The billing department verifies the patient's IPA/payor information that was provided by the

_____

[4] Quest refers to this testimony as shocking. We note, however, that the hypothetical did not explain how the specimen was delivered to the laboratory. There was no mention of a drop box.

8

physician on the Quest requisition form. If the information is insufficient or inaccurate, the billing department contacts the physician's office to obtain the correct information. On average, the verification process takes about one to two days, but can take several weeks depending upon the situation. The verification process is "further complicated when patients switch IPA's, switch health plans, or where the patient is a Medi-Cal beneficiary and no insurance information is included. Additionally, the process can be delayed if any of Medi-Cal or health plan portals are temporarily down."[5]

Quest argued that because the conduct of the parties must be interpreted in light of the subject matter and surrounding circumstances (citing *Marvin v. Marvin* (1976) 18 Cal.3d 660, 678, fn. 16), the court must consider the stability of the specimens and the implications to patient health and safety. According to Sevag Bedrosian, director of specimen management at Quest, Quest receives "specimens that must be tested within 24 hours, and some specimens must be tested within two or three hours. Until the specimen is received and accessioned, we do not know how quickly the specimen must be tested." Quest receives "specimens 24 hours per day. On average we receive 45,000 requisition forms per day and test[] over 120,000 specimens. It is not possible to make billing determinations prior to specimen testing due to specimen stability, patient health and safety, timely reporting to physicians, and availability of trained staff all times during the day and night."

C.    *Arguments of the Parties*

*Implied-in-Fact Contract.* Angeles denied that an implied-in-fact contract between Angeles and Quest is created when an Angeles physician places a specimen with a completed Quest requisition form for an Angeles patient inside a Quest drop-box. Quest's business decision to test specimens before verifying the patient's IPA/payor is not attributable to any error, agreement, or conduct by Angeles. Angeles physicians are allowed to belong to other IPA's, and Quest provides lock boxes for those physicians

---

[5] Robert Moverley, Quest's vice president of operations for the western United States, provided a declaration that confirmed Stonebreaker's descriptions of the lock boxes, the testing process, and the payor verification process.

9

who belong to Quest-affiliated IPA's. Quest, not Angeles, is responsible for training physicians who belong to Quest-affiliated IPA's to correctly fill out the Quest requisition forms. If Quest's lock box system is resulting in the misdirection of specimens, Quest has the ability to modify that system.

Quest contended that an implied contract arises when an Angeles physician obtains the patient's specimen, fills out a Quest requisition form with "the name of the physician and/or clinic, the patient's name, and specific biological or fluid tests requested," and places the specimen and completed requisition form inside a Quest drop box. Quest argued that through this course of conduct, Angeles implicitly authorizes Quest to perform the test ordered because the physician is the authorized agent of Angeles.

*Unjust Enrichment.* As to unjust enrichment, Angeles argued it is a remedy rather than an independent basis of recovery, and that because Angeles contracts with other laboratories and pays capitated fees for their services, it should not have to pay Quest for the same services. Forcing Angeles to pay twice would increase the cost of health care, which is contrary to public policy. Angeles pointed out that "Quest is not precluded from recovering for its services. It retains the right to seek payment from the physicians who requested these services."

Quest disagreed. It argued that the health plans delegated to Angeles their obligation to provide outpatient laboratory services to their enrollees, "and Angeles thus assumes the full financial risk to provide those services. . . . A portion of those services are being performed by Quest. However, Angeles is not compensating Quest from the money it receives from the health plans. This is unjust." Because the laboratory that contracted to provide services for Angeles does not perform the tests that were misdirected to Quest, "the costs of that lab to perform those tests are not incurred by the laboratory, and thus Angeles receives the benefit of a lower negotiated contract rate that would otherwise be higher if the other laboratory accounted for the tests it is not performing. In this way, there is a financial motivation for Angeles to continue to allow physicians to misdirect specimens, because Angeles benefits in allowing this to happen."

10

Quest suggested that Angeles has a financial incentive to ignore the misdirection of specimens to Quest: "The court need look no further than Angeles' own President, Founder, Shareholder, and contracted physician, Dr. Azurin, who ordered dozens of tests from Quest after the contract terminated, which remain unpaid. [Internal record reference omitted.] The same can be said about Dr. Rodas. [Internal record reference omitted.] Nothing could more clearly challenge the assertion that Angeles 'informs' its physicians to stop sending specimens to Quest when its own President and Founder continues to order tests from Quest. Actions speak louder than words."

Quest claimed that it cannot prevent physicians from misdirecting specimens for several reasons. "First, as Angeles admits, its physicians are members of other IPAs that are contracted with Quest. . . . Quest cannot simply remove the drop boxes from the offending physicians' offices because those physicians belong [to] other IPAs that are contracted with Quest. [¶] Second, . . . the couriers who pick up the specimens from those drop boxes do not open the sealed bags [for a variety of reasons] . . . . [T]he testing process could not be performed in a timely manner if every courier inspected every specimen from every physicians' drop box prior to delivering the specimen to the laboratory." Additionally, "the billing process can take weeks if the physicians fail to include all of the billing information. In this case, as per the requisition forms for Drs. Azurin and Rodas, they were mistaken in contending that the patient belonged to Apple Care. This is one of many instances where the billing determination is delayed. However, what cannot be delayed, as is clear from the Declaration of Dr. Hilborne, is the testing of an already collected specimen, so as to avoid spoilage, loss of irreplaceable specimens, reporting of false results, administration of often time sensitive lifesaving treatment, or other harm to the patient."

*Implied-in-Law Contract.* Angeles' position is that no implied-in-law contract is created by the Knox-Keene Act, and that, contrary to Quest's assertions, none of the statutes discussed imposes a legal obligation on Angeles to pay for post-contract testing services:

11

- Health and Safety Code section 1371, a part of the Knox-Keene Act, requires a health care service plan to process a claim within 30 days.

- Health and Safety Code section 1375.4, a part of the Knox-Keene Act, regulates the relationship between health plans and risk-bearing organizations like Angeles. The section specifies provisions that must be included in a contract between the health plan and the risk-bearing organization. The section does not create any rights or duties between the risk-bearing organization and health care providers that contract with the risk-bearing organization. Moreover, section 1375.4 does not create a private right of action for damages. The statute is enforced by the California Department of Managed Health Care. A private party may only sue to enjoin a violation of the Act. (Citing *California Medical Assn. v. Aetna U.S. Healthcare of California*, *Inc.* (2001) 94 Cal.App.4th 151, 161; *Samura v. Kaiser Foundation Health Plan*, *Inc.* (1993) 17 Cal.App.4th 1284, 1299.)

- Health and Safety Code section 1371.8 provides that once a health plan authorizes a provider to provide a specific treatment, that authorization may not be rescinded or modified after the provider renders the service in good faith and pursuant to the authorization. This provision does not impose an obligation on Angeles to pay for services that it did not authorize.

- Section 1300.75.4 of title 28 of the California Code of Regulations provides definitions of terms such as "external party," "organization," "risk arrangement," "solvency regulations," "cash-to-claims ratio," "corrective action plan," and "grading criteria." It does not regulate the relationship between Angeles and Quest.

- Finally, part 493.1804 of title 42 of the Code of Federal Regulations regulates laboratories in order to protect against substandard testing. Business and Professions Code section 1209 discusses the duties of a

laboratory director, and section 2001 creates the Medical Board of California.

Quest contended that through its contracts with various health plans, Angeles assumed the risk of providing benefits, including covered laboratory testing services, to enrollees of the plans, and that the Knox-Keene Act requires IPA's to manage the assigned risks, including the risk of payment for covered laboratory testing services. Because laboratory testing services are a covered service, and because Angeles is paid by the health plans to provide that service, Angeles is required under its risk-shifting agreements to pay for the services that Quest provided to its patients. By failing to pay for the covered laboratory testing services, Angeles accepted a benefit—the capitated payment from the health plans—for which the Knox-Keene Act implies an obligation to pay.

Quest explained it is not arguing that "Angeles violated the Knox-Keene Act and thus should pay Quest damages." Instead, it relies on the "legislative scheme of which the Knox-Keene Act is a part in order to answer the overarching question in this case— whether injustice would be caused because the legislative scheme reflects a public policy that shifts the obligation to pay for laboratory services to an IPA. Here, the question must be answered in the positive."

Quest argued that an implied-in-law contract exists for two additional reasons. First, it is prohibited from billing physicians for services provided to Angeles patients who are enrolled in Medi-Cal or the Healthy Families program. (Citing Welf. & Inst. Code, § 14019.4, subd. (a) [if health care provider knows patient belongs to Medi-Cal, patient may not be billed, and the only entities that may be billed are the department and the third party payor]; Ins. Code, § 12693.55 [similar provision with respect to Healthy Families program].) Second, Health and Safety Code section 1371.8 prohibits a health plan from rescinding or modifying its authorization of service after the provider renders the service in good faith and pursuant to the authorization.

13

*D.   Trial Court's Ruling*

The trial court found no triable issue of material fact, and granted summary adjudication of all causes of action except breach of contract and breach of third party beneficiary contract, which Quest later dismissed with prejudice.

The court found Angeles was not unjustly enriched by the "free" post-contract tests that Quest provided to its patients. There was no evidence that the contracted laboratories negotiated a lower rate from Angeles because Quest performed some of their work. Quest was free to bill the physicians who ordered the post-contract tests. Angeles had no agency relationship with the in-network physicians, and did not exercise control over their medical treatment and patient care decisions. Because Angeles terminated its fee-for-service contract with Quest and specifically notified its physicians not to use Quest, there was no basis to support an implied agreement to pay Quest. Nor does any statute or regulation explicitly require Angeles to pay Quest. Requiring payment would frustrate the public policy behind managed care and capitated agreements.

Quest moved for reconsideration based on newly discovered evidence that Lab Corp provides Angeles with certain tests on a fee-for-service rather than capitation basis. It argued that as to those specific tests, Angeles unjustly benefits by having another laboratory such as Quest perform those tests for free. Angeles director Dr. Daniel Matemotja explained in his declaration that the tests that are provided by Lab Corp on a fee for service basis typically take at least 48 hours to complete, and generally the physicians do not expect them to be performed immediately or on an emergency basis. The trial court granted reconsideration, and then affirmed its previous summary adjudication rulings.

Following Quest's dismissal with prejudice of the remaining causes of action for breach of contract and breach of third party beneficiary contract, the trial court entered judgment for Angeles based on the summary adjudication rulings. This timely appeal followed.

14

## DISCUSSION

Section 437c, subdivision (f)(1) of the Code of Civil Procedure authorizes a motion for summary adjudication as to any cause of action, affirmative defense, or claim for damages. The motion is treated "in all procedural respects as a motion for summary judgment." (§ 437c, subd. (f)(2).)

We review the summary adjudication ruling under the same de novo standard of review that applies to an order granting summary judgment. (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 363.) "On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] . . . [W]e construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it." (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202.)

### A. Implied-In-Fact Contract

An implied-in-fact contract is based on the conduct of the parties. (Civ. Code, § 1621.) Like an express contract, an implied-in-fact contract requires an ascertained agreement of the parties. (*Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 102, p. 144.)

Whether an implied contract exists """"is usually a question of fact for the trial court. Where evidence is conflicting, or where reasonable conflicting inferences may be drawn from evidence which is not in conflict, a question of fact is presented for decision of the trial court. . . ." [Citation.]' (*Caron v. Andrew* (1955) 133 Cal.App.2d 412, 416.)" (*Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1508.) For summary judgment purposes, the question is whether a triable issue of material fact exists. (See *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 748.)

The issue here is whether the referral of specimens to Quest by Angeles physicians who either misidentified the patient's IPA/payor or failed to identify an IPA/payor at all created an implied-in-fact contract that Angeles would pay for the tests. It did not.

15

Angeles contends that it did not create an agency relationship with its physicians. The agreement between Angeles and the physician specifically defined the relationship as that of independent contractors, and required the physician to provide, coordinate, supervise, and monitor the medical care for each patient. Angeles argues that if a physician elects to use a non-contracted laboratory, the physician is free to do so; Angeles cannot interfere with the physician-patient relationship. But it is not obligated to pay for that out-of-network service.

Angeles points out that it did nothing to mislead Quest to believe that it would be paid by Angeles for the post-contract tests. Quest, not Angeles, placed Quest drop boxes in the offices of physicians who are members of IPA's that use Quest's services. When those physicians mistakenly placed specimens from Angeles patients into the Quest drop box, they did not list Angeles on the requisition form as the patient's IPA/payor. Angeles argues that it "has no control over Quest's intake procedures. It is Quest that decides to provide drop boxes in physician's offices. It is Quest that creates and provides the requisition forms to the physicians and trains them as to how to complete those forms. It is Quest that knows which physicians erroneously send specimens to it. It is Quest that chooses not to require the physician's office to perform a preliminary verification before it can print a Quest requisition form. It is Quest that chooses to pick up those specimens and process them before verifying whether it has a contract."[6]

Quest contends that the phrase "on behalf of" in the contract between Angeles and its physicians created a principal-agent relationship between them. The statement is that the physicians will provide medical care and services "on behalf of" Angeles to its enrollees. Quest argues that when an Angeles physician misdirects a specimen to a non-

---

[6] Quest contends that although it pre-screens patients who are sent to draw stations, not everyone can go to a draw station (e.g., more invasive tissue samples can only be taken by physicians). Quest argues that any dispute regarding the reasonableness of its intake procedures must be resolved at trial. In light of our determination that the physicians who misdirected specimens to Quest were not acting as ostensible agents of Angeles, the reasonableness of Quest's intake procedures is not a material issue of fact.

16

contracted laboratory, the principal—Angeles—becomes bound by an implied-in-fact agreement to pay for that test.

This reading would render the independent contractor provision of the agreement between Angeles and its physicians a nullity, and would be contrary to the general rule of contract interpretation that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) This rule is intended "to disfavor constructions of contractual provisions that would render other provisions surplusage. [Citation.]" (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503.)

The independent contractor provision is consistent with the general understanding that physicians who contract with IPA's are considered to be "independent contractors responsible for their own separate medical practices." (*Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal.App.4th 1146, 1149, fn. 2.) Even under Quest's theory that it is possible for physicians to be both independent contractors and agents of an IPA, there is no evidence that Quest was misled by the conduct of the physicians to believe that Angeles would pay for the post-contract tests. Until Quest ferreted out the patient's IPA/payor information, it was unaware that the patient belonged to Angeles. Given that the relationship between Angeles and its physicians was that of independent contractors, the physicians' misdirection of specimens, which was neither caused nor ratified by Angeles, did not create an implied agreement that Angeles would pay for the post-contract tests.

Quest knew that as of November 30, 2009, its services were no longer authorized by Angeles. Quest conceded at oral argument that the physicians are liable on a negligence theory, but argued that pursuing them individually would involve a multiplicity of lawsuits for relatively small sums. Regardless of the inconvenience of pursuing the physicians individually, there is no support for the theory that Angeles must pay for post-contract tests which Quest had been told Quest was not authorized to perform. Civil Code section 2318 is controlling: "Every agent has actually such authority as is defined by this Title, unless specially deprived thereof by his principal, and

17

has even then such authority ostensibly, except as to persons who have actual or constructive notice of the restriction upon his authority."

Quest's reliance on *Eamoe v. Big Bear Land & Water Co.* (1950) 98 Cal.App.2d 370 (*Eamoe*) is misplaced. In that case, the owner of real property (Big Bear) retained an agent to sell its parcel in Tract 164. The agent mistakenly showed the buyer (Eamoe) a parcel in Tract 159, and Eamoe signed a contract of sale on the assumption that he was purchasing that parcel. When the mistake came to light, Eamoe incurred the expense of disassembling the house he had built in Tract 159 and moving it to Tract 164. Eamoe then sued Big Bear for the misrepresentations by its agent. At trial, Big Bear successfully moved for nonsuit based on the provision in the contract of sale that limited the authority of the seller's agent. Eamoe appealed, arguing that the limitation of authority did not relieve Big Bear of liability.

The appellate court reversed and remanded for a new trial, holding that Eamoe "was justified in believing that the agent had authority to show and sell property of the principal, knew which property belonged to the principal, and was authorized to issue a receipt containing a correct description of the property displayed. Furthermore, it may reasonably be assumed that the principal here relied on the agent to describe the property correctly, since it executed and sent to [Eamoe] a contract containing the same description as that given by the agent." (*Eamoe*, *supra*, 98 Cal.App.2d at p. 374.) "To epitomize, it may be said that when an agent on behalf of his principal performs an unauthorized act, if the principal has put the agent in a position to mislead innocent parties, he is responsible to the latter." (*Ibid.*)

The seller in *Eamoe* did not deny the existence of an agency relationship. By contrast, here there is no evidence of an agency relationship between Angeles and its in-network physicians. Angeles does not exercise control over the manner in which the physicians provide medical care to their patients. Moreover, as discussed, the physicians who used Quest drop boxes after the November 30, 2009 termination date did so based on their membership in a Quest-affiliated IPA, their mistaken belief that the patient also belonged to that IPA, or some other error.

18

*B.      Quasi-Contract*

Unlike an implied-in-fact contract, an implied-in-law contract or quasi-contract is not based on the intention of the parties, but arises from a legal obligation that is imposed on the defendant. (*California Medical Assn. v. Aetna U.S. Healthcare of California*, *Inc., supra,* 94 Cal.App.4th 151, 171, fn. 23.) "The right to restitution or quasi-contractual recovery is based upon *unjust enrichment.* Where a person obtains a *benefit* that he or she may not *justly retain*, the person is unjustly enriched. The quasi-contract, or contract 'implied in law,' is an *obligation* . . . created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money. [Citations.]" (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102.)

The parties disagree whether Angeles derived an unjust benefit from post-contract tests performed by Quest for Angeles patients whose specimens were placed in a Quest drop box by their physicians. We are guided by the court's discussion in *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc., supra,* 94 Cal.App.4th 151, 173–174: "Finally, CMA's quasi-contract claim must also fail because under the circumstances alleged here, any benefit conferred upon defendants by Physicians was simply an incident to Physicians' performance of their own obligations to Intermediaries under the Intermediary-Physician Agreements. (*Major-Blakeney Corp. v. Jenkins* (1953) 121 Cal.App.2d 325, 340–341.) As noted by the appellate court in *Major-Blakeney Corp.*, "'A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution."' (*Id.* at pp. 340–341; accord, *Griffith Co. v. Hofues* (1962) 201 Cal.App.2d 502, 508; see 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 97, pp. 126–127 ['where the plaintiff acts in performance of his own duty or in protection or improvement of his own property, any incidental benefit conferred on the defendant is not unjust enrichment'].)"

As discussed, Quest tested the specimens of Angeles patients that were misdirected to Quest by their physicians as a result of clerical error, carelessness, or some

19

other mistake concerning the identity of the patient's IPA/payor. Any benefit conferred upon Angeles, which did not cause the misdirection of the specimen to Quest, was unintended. "'The fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. [Citation.]' [Citations.]" (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 389, quoting *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1663.)

There is no evidence that Angeles actually paid its in-network laboratory a lower capitation rate as a result of the work that was misdirected to Quest. Quest contends that such evidence is unnecessary because, as a matter of general economic theory, we may take judicial notice that any windfall to the in-network laboratory was eventually reflected in the reduction of its negotiated rate. But even under such a theory, Quest must provide supporting evidence of an actual reduction in the capitation rate that was tied to the misdirected work; because the amount of the alleged decrease is neither readily verifiable nor a matter of general knowledge, a general economic theory is insufficient to fill the evidentiary gap. (See Evid. Code, §§ 452, 459.)

Quest argues that Angeles should pay for the post-contract tests and cap-deduct the physicians who misdirected the specimens, as it did earlier. But Quest does not explain why or how the voluntary payment of some unauthorized claims created an obligation to pay for other unauthorized claims.

Quest has not identified a statute or regulation that requires an IPA to pay an out-of-network laboratory where there is no contractual obligation to do so. Health and Safety Code section 1375.4, which sets forth necessary provisions in a contract between a health plan and a risk-bearing organization, does not create any rights or duties between risk-bearing organizations such as Angeles and health care providers such as Quest. (See *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.*, *supra*, 94 Cal.App.4th at p. 163 [Knox-Keene Act provision that imposed procedural requirements on processing claims did *not* impose statutory obligation on health plans to pay treating physicians despite lack of contractual obligation to do so].)

20

Subdivision (b) of Business and Professions Code section 1220, which requires clinical laboratories to be "conducted, maintained, and operated without injury to public health," and parts 493.1232 and 493.1241 of title 42 of the Code of Federal Regulations, which require laboratories to ensure the optimum integrity of specimens and to provide accurate and timely testing and reporting of results, do not compel a different result. The obligation of a clinical laboratory to provide testing services in a professional manner does not give rise to an obligation on the part of Angeles to pay for services that it did not authorize.

Similarly, sections 20(1) and 22 of the Restatement of Restitution 3d,[7] which address the provision of unrequested services for the protection of another's life or health, do not advance Quest's position.[8] This is not a case of unrequested services. All of the disputed tests were performed at the direction of physicians who filled out Quest requisition forms. We therefore conclude that these sections are inapplicable.

In *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, non-contracted emergency room physicians sought reimbursement from Blue Cross for emergency services provided to its enrollees. Blue Cross successfully demurred. It argued that

---

[7] Angeles argues that because these Restatement provisions were not mentioned below, they may not be raised for the first time on appeal. In light of our broad discretion to consider a legal theory that is raised for the first time on appeal, we conclude that the doctrine of forfeiture does not apply where, as here, a party raises additional support for a theory that was argued below. (See *Steves v. Owens-Corning Figberglas Corp.* (1996) 49 Cal.App.4th 1645, 1654.)

[8] According to section 20(1) of the Restatement of Restitution 3d, "[a] person who performs, supplies, or obtains professional services required for the protection of another's life or health is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision *to intervene without request*." (Italics added.) Section 22(1) provides that "[a] person who performs another's duty to a third person . . . is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to *intervene without request*." (Italics added.) Section 22(2)(b) states that "*Unrequested* intervention may be justified in the following circumstances: . . . the claimant may be justified in performing another's duty to furnish necessaries to a third person, to avoid imminent harm to the interests of the third person . . . ." (Italics added.)

21

section 1371.4 of the Health and Safety Code, a provision of the Knox-Keene Act, governs the reimbursement of hospital emergency medical services, and because the Act may be enforced only by the Department of Managed Health Care, the physicians lacked standing to seek reimbursement. The appellate court reversed the order of dismissal, holding that the non-contracted physicians were free to pursue alternative remedies against Blue Cross, including a common law claim for quantum meruit. (*Id.* at p. 215.) In *Bell*, the underlying obligation to provide emergency room medical services regardless of the patient's ability to pay was created by statute. But in this case, a similar statute requiring Quest to perform misdirected tests regardless of the patient's ability to pay does not exist.

Finally, the argument that Quest is precluded by law from billing physicians of patients who are enrolled in Medi-Cal or the Healthy Families program does not alter our decision. Regardless of any right of recovery against the physicians, there is no basis for recovery under an implied-in-law contract theory against Angeles.

### C. Remaining Causes of Action

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' [citations]." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) In light of our determination that Quest had no understanding or expectation of payment of unauthorized post-contract tests, we conclude that summary adjudication of the quantum meruit claim was proper.

We reach the same conclusion as to the causes of action for work, labor and services/agreed price, open-book account, account stated, reasonable value of work, labor and services, and common counts. As discussed, Quest performed the tests under the mistaken belief that it had a contract with the payor. Because Quest had no contract with

22

Angeles, which had no prior knowledge that specimens had been sent to Quest, there is no money owed.

## DISPOSITION

The judgment is affirmed.  Angeles is entitled to its costs on appeal.

EPSTEIN, P. J.

We concur:

WILLHITE, J.                    MANELLA, J.

Filed 2/1/16

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FOUR

| | |
|---|---|
| UNILAB CORPORATION etc. et al., | B255136 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. VC060983) |
| v. | |
| ANGELES-IPA etc., | ORDER GRANTING REQUEST FOR PUBLICATION AND ORDER MODIFYING OPINION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT*

Burhenn & Gest and Howard Gest, counsel for respondent Angeles-IPA, and Grodsky & Olecki and Michael J. Olecki, on behalf of nonparty Employee Health Systems Medical Group Inc., have requested that our opinion filed on January 13, 2016, be certified for publication. (Cal. Rules of Court, rule 8.1120.) It appears that our opinion meets the standards set forth in California Rules of Court, rule 1105(c)(2), (c)(4), and (c)(6). The requests are granted.

The opinion is ordered published in the Official Reports with the following modification: On page 16, the first sentence of the first paragraph, beginning with the words "Angeles contends that," is deleted. There is no change in judgment.

_____

*EPSTEIN, P.J.                    WILLHITE, J.                    MANELLA, J.